**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. _____**

PEDRO E. JUAN, on his own behalf
and all others similarly situated,

      Plaintiff,

v.

HEMATITE LAND PARTNERS LLC;
HEMATITE AGGREGATES LLC;
PARTNERSHIP REPRESENTATIVE MANAGEMENT LLC;
ORNSTEIN-SCHULER GROUP LLC;
ORNSTEIN-SCHULER INVESTMENTS LLC;
ORNSTEIN-SCHULER CAPITAL PARTNERS LLC;
WEIBEL & ASSOCIATES, INC.;
ECOVENTURES LLC;
GALT MINING LLC;
JASON D. BROWN;

      Defendants.

_____ /

**<u>VERIFIED CLASS ACTION COMPLAINT</u>**

     Plaintiff PEDRO E. JUAN, on his own behalf and all others similarly situated (collectively,

"Plaintiffs") hereby sue Defendants HEMATITE LAND PARTNERS LLC; HEMATITE

AGGREGATES LLC; PARTNERSHIP REPRESENTATIVE MANAGEMENT LLC;

ORNSTEIN-SCHULER GROUP LLC; ORNSTEIN-SCHULER INVESTMENTS LLC;

ORNSTEIN-SCHULER CAPITAL PARTNERS LLC; WEIBEL & ASSOCIATES, INC.;

ECOVENTURES LLC; GALT MINING LLC; and JASON D. BROWN (collectively,

"Defendants") and state as follows:

## INTRODUCTORY STATEMENT

1.      This case involves a multi-year fraudulent scheme by a group of supposedly independent and respected financial investment professionals who knowingly conspired to develop, promote, sell and implement a tax-savings strategy, commonly known as a Syndicated Conservation Easement Strategy (the "SCE Strategy"), whereupon Defendants (collectively and through a criminal conspiracy) leveraged their expertise, experience, and reputation to induce Plaintiffs (and hundreds of other clients cross several of the United States) to participate in numerous transactions involving the SCE Strategy by promoting the SCE Strategy as a legitimate tax-savings product. By design, the SCE Strategy involved complex partnership structures and a series of steps that required specialized knowledge of conservation easements and highly technical tax laws and regulations. But beneath these complex structures hid the truth (which was purposefully obscured from Plaintiffs, other clients, and the Internal Revenue Service ("IRS")): the SCE Strategy was simply an attempt by Defendants to convey a substantial real estate interest to a co-conspiring charity, after fraudulently and grossly inflating its value, and sell the corresponding tax deduction to Plaintiffs and other clients for lucrative professional fees.

2.      Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes. Indeed, part of the sales pitch to Plaintiffs was the (noble) goal of preserving valuable land for the greater public good.

3.      When properly valued and implemented, conservation easements can and do confer legitimate tax advantages to the donor in additional to environmental benefits to the public. When such easements are placed on property in strict compliance with Section 170(h) of the Internal Revenue Code (the "Code"), donors of such easements may realize a noncash charitable

contribution deduction for the value by which the easement impairs the fair market value of the property.

4.      Under Section 170(h)(7)(A) of the Internal Revenue Code, a contribution by a partnership "is not treated as a qualified conservation contribution for purposes of IRC Section 170 if the amount of such contribution exceeds 2.5 times the sum of each partner's relevant basis in such partnership, as defined in IRC Section 170(h)(7)(B)."

5.      As alleged herein, The SCE Strategy provided to Plaintiffs was not properly and legitimately valued or implemented and was never intended to be. It also intentionally did not comply with Section 170(h) of the Code, and the Defendants were on notice of such illegitimacy.

6.      In working together to implement the SCE Strategy, including drafting various documents necessary to implement the SCE Strategy, the Defendants ignored controlling law and directives from the IRS, going back decades.

7.      As it came to be: the SCE Strategy was fatally flawed from the outset and was ultimately denounced by the IRS.

8.      This lawsuit seeks to hold the Defendants liable for their misconduct.

## **PARTIES**

9.      Plaintiff DR. PEDRO E. JUAN is an individual *sui juris* and a resident of Miami-Dade County, Florida.

10.     Defendant HEMATITE LAND PARTNERS LLC is an Alabama limited liability company.

11.     Defendant HEMATITE AGGREGATES LLC is an Alabama limited liability company.

12.     Defendant PARTNERSHIP REPRESENTATIVE MANAGEMENT LLC

13.     Defendant ORNSTEIN-SCHULER GROUP LLC is a Georgia limited liability company.

14.     Defendant ORNSTEIN-SCHULER INVESTMENTS LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia

15.     Defendant ORNSTEIN-SCHULER CAPITAL PARTNERS LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.

16.     Defendant WEIBEL & ASSOCIATES, INC. is a corporation organized and existing under the laws of Georgia with its principal place of business in Tucker, Georgia. This Defendant has appeared herein.

17.     Defendant ECOVENTURES LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.

18.     Defendant GALT MINING LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.

19.     Defendant JASON D. BROWN is an individual *sui juris* and a resident of Georgia.

### JURISDICTION AND VENUE

20.     ***Federal Question Jurisdiction.***   This Court has subject matter jurisdiction action inasmuch as it asserts a federal question.

21.     18 U.S.C. § 1964 provides a civil cause of action for violations of 18 U.S.C. 1962 (the Civil RICO statute).

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class (named or unnamed) is a citizen of a state that is different from at least one Defendant's state of citizenship.

23.     The aggregate amount in controversy exceeds $75,000.00.

24.     In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

25.     This Court has personal long arm jurisdiction over Defendants pursuant to Florida Statute 48.193(1)(a)(2) because, as described in greater detail below, Defendants committed tortious acts against Plaintiffs within this District and/or committed tortious acts outside of this District causing injury in this District to Plaintiffs – thereby submitted themselves to the jurisdiction of the courts of this State.

26.     Without limitation, Defendants have (individually and/or in concert):

    a.   transacted business in Florida;

    b.   contracted to supply or obtain services in Florida;

    c.   availed themselves intentionally of the benefits of doing business in Florida;

    d.   produced, promoted, sold, marketed, and/or distributed their products or services in Florida and, thereby, have purposefully profited from their access to markets in Florida;

    e.   caused tortious damage by act or omission in Florida;

    f.   caused tortious damage in Florida by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such

jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.   committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Florida to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h.   engaged in a conspiracy with others doing business in Florida that caused tortious damage in Florida; and/or

i.   otherwise had the requisite minimum contacts with Florida such that, under the circumstances, it is fair and reasonable to require the Defendants to come to Court to defend this action

27.   Personal jurisdiction over Defendants meets the minimum contacts or due process requirements such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice because modern methods of transportation and communication (e.g., Zoom and other video conferencing platforms) reduce significantly any burden on Defendants to litigate in the State of Florida; and because The State of Florida has a strong interest in seeing this matter resolved in Florida, as the dispute involves services performed by out-of-state companies to a Florida company.

**VENUE**

28.     Venue is proper under 28 U.S.C. § 1391, because, inter alia, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of the Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.

29.     Any conditions precedent to bringing this action have been performed, have occurred, have been waived, or have otherwise been excused.

## FACTS COMMON TO ALL COUNTS

**The History and Purpose of Conservation Easements**

30.     A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

31.     In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

32.     A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes. Before a deduction can be claimed, however, certain criteria must be met. As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**The Government's Historical and Repeated Warning Related to Conservation Easements.**

33.     As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122). The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property. Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  Because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS. Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property

34.     Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA"). DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under § 170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under § 170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

35.     The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA § 155(a). The relevant regulation reiterates that no deduction under IRC § 170

shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

36.     These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

37.     In 2004,[1] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including inter alia, failure to substantiate the fair market value of the tax benefit and other valuation issues. At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

38.     In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

**The Rampant Use and Solicitation of Conservation Easements By Ornstein-Schuler.**

---

[1] *See* IRS Notice 2004-41 (July 12, 2004).

39.     Between 2012 and 2018, Ornstein Schuler was engaged in the solicitation of several conservation easements, aggressively promoted (and heavily profit from) such conservation easements.

40.     Eventually, Defendants moved into soliciting *syndicated* conservation easements, which greatly expanded the purported market for the easements by making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

41.     The Defendants SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (i.e., the "Syndicates"). To achieve this end, Defendants formed the Syndicates as limited liability companies ("LLCs") under state law, which are taxed as a partnership (i.e. a pass-through entity) for federal tax purposes. The Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate in a conservation easement transaction.

42.     An entity taxed as a partnership (like an LLC) is not liable for income tax. Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to the partners from the partnership. Under the Code, charitable contributions are one item that flow through to the individual partners.

43.     Although a partnership does not pay federal income tax, it still has filing and reporting requirements. Specifically, a partnership is required to file an annual return on Form 1065 that reports the partnership's income, deductions, gain, losses, etc. The partnership is also required to furnish statements, called K- 1s, to its members (with copies to the IRS) that report inter alia each member's distributive share of partnership income or loss and separately stated items.

44.     The members are then required to report on their individual tax returns their share of the partnership income, loss and/or separately stated items, as they are contained on the K-1s provided to them by the partnership. In the case of the SCE Strategy, the Plaintiffs and the Class (i.e., the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the K-1 they received from the respective Syndicate in which they were a member, as required by law. The Return Preparers prepared the Syndicate returns and the K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants and the Other Participants.

45.     Here: the Defendants planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in virtually every material way:

a.  First, a "Sponsor" (e.g., Ornstein-Schuler or an affiliate) obtains a majority interest in property from a third party ("Landowner"). This is accomplished through a series of steps: (1) the Sponsor creates a limited liability company ("PropCo"); (2) at the time PropCo is formed, Landowner is the 100% owner of PropCo and Landowner then deeds land into PropCo; and (3) the Sponsor (or its affiliate) purchases a majority interest (usually around 98%) in PropCo from Landowner.

b.  Second, prior to completing the purchase of the majority interest, the Sponsor (or its affiliate) conducts a "due diligence" period during which it obtains an initial appraisal ("Initial Appraisal") of the land from one of its hand-picked appraisers (the "Primary Appraiser") and engages a consultant (e.g., a mining engineer, land development consultant, and/or conservation consultant) to assess the land for its alleged intended purpose, as explained below. The Initial Appraisal purports to provide a valuation based on the Highest and Best Use (also referred to as the

"HBU") of the land. The Primary Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs and members of the Class. During the due diligence period, other consultants purportedly assist with conservation management, determining the HBU of the Property, and perform other services in connection with and support of the "Conservation Easement Option."

c.   Third, the Sponsor (or its affiliate) hires a consulting firm or consulting firms to purportedly evaluate the potential for development of the Property, which was never economically viable but was used later by the Appraisers to arrive at an overstated HBU.

d.   Fourth, the Sponsor (or its affiliate) forms a second limited liability company (the "Syndicate") and sends marketing materials (the "Promotional Materials") to potential participants. These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy. In the Promotional Materials, the Defendants also specifically tout the tax benefits of a conservation easement for potential participants (the "Conservation Easement Option"), improperly promising them a legal return of more than 2.5 times the amounts paid into the Syndicate(s).

e.   Fifth, after the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but 0.5% of its interest in PropCo to the Syndicate in exchange for cash. The end-result is PropCo (which holds the critical property) is owned 97.5% by the Syndicate, 0.5% by the Sponsor (or its affiliate), and 2% by Landowner.

f.   Sixth, the Sponsor (or its affiliate) obtains a second appraisal or an appraisal review from another one of its hand-picked appraisers ("Secondary Appraiser") (the Primary Appraisers and Secondary Appraisers are included within the definition of "SCE Appraisers" set out supra). Once again, the appraisals obtained by the Sponsor (or its affiliate) purport to value the land at its HBU.

g.   Seventh, the Defendants prepare a Conservation Easement Deed.

h.   Eighth, the Defendants prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

i.   Ninth, PropCo then donates a conservation easement to a land trust (the "Land Trust") and the remaining fee simple interest in the land to an affiliate of the Land Trust ("Land Trust Affiliate"), thus allowing the Sponsor to not have any continuing obligation with respect to the remaining partnership assets.

46.   The donation of the conservation easement is reported as a charitable contribution and its value reported by the Syndicate according to the Appraisal. The value of the charitable contribution is reported as a charitable contribution deduction on the Syndicate's tax return (prepared by hand-picked return preparers). The amount of the charitable contribution deduction reported on the Syndicate's tax return equals the purported decrease in the property's appraised value resulting from the alleged restriction placed on the property by virtue of the conservation easement. This deduction is then allocated to each Syndicate member based on their respective ownership interests in the Syndicate. Each Syndicate member reports their allocated deduction on their individual tax return as reflected in the K-1 they receive from the Syndicate's tax preparer.

47.     In reality (and unbeknownst to Plaintiffs and the Class), the SCE Strategy, as developed, structured and implemented by some or all of the Defendants, amounts to nothing more than a sale of grossly overvalued and ineffectively structured federal tax deductions that the IRS was already carefully scrutinizing and indicating to professional advisors it would disallow

48.     In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price. In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions. Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

49.     Based on the foregoing: Defendants were on notice as early as 2017 that their SCE Strategy was likely to be flagged as improper under applicable Treasury regulations.

50.     The Defendants knew or should have known that the IRS would conclude that the charitable contribution deductions from the SCE Strategy were improper, as structured and implemented, due to inter alia the lack of support for the inflated appraisals of the donated property interests, the failure to substantiate a valid conservation purpose, defective Conservation Easement Deeds, defective Baseline Documentation Reports, the promise of legal charitable contribution tax deductions worth many times more than the amount paid into the Syndicates, and the Defendants' other failures to comply with the necessary requirements for claiming proper conservation easement charitable contribution deductions. Despite these issues, the Defendants and the Other Participants continued to promote, sell and implement the SCE Strategy and advise Plaintiffs and the Class that the SCE Strategy and its tax benefits were legal and legitimate.

51.     In working together to implement the SCE Strategy, the Defendants handpicked the appraisers to be used for the SCE Strategy.

52.     These appraisers included Defendant Weibel & Associates, Inc. cast aside its professional obligations and duties and created sham Appraisals with grossly inflated valuations that would not be acceptable to the IRS.

53.     The Defendants knew that and intended for these grossly inflated appraisals would be unknowingly used by the Plaintiffs and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs and the Class, were completely unsupportable and in violation of some of the most basic rules and concepts for land appraisals.

54.     The appraisals were part of a broader SCE Strategy which included insupportable finding of Highest and Best Use ("HBU").  To concoct an HBU that would support the valuation that the Defendants sought, the appraisers made false assumptions and ignored inconvenient facts that enabled them to determine a HBU for subject properties for which no objective appraiser would concur. The HBU determined by the appraisers relied on equally improper land development and mining reports (upon information and belief prepared by Defendants Ecoventures and Galt Mining) for the express purpose of assisting with SCE scheme.

55.     These reports purported to provide a basis for developing the properties for development or mining purposes, when in reality the Defendants all knew that development or mining was not economically feasible.

56.     Defendants even created a lobbying organization called Partnership For Conservation ("P4C") that was organized in part to disseminate falsehoods about valuation in connection with SCEs to "gaslight" Congress, the IRS and most importantly, prospective investors.

57.     A portion of Plaintiffs investment in the SCE Strategy was paid to lobby P4C.

58.     In accordance with the Defendants' pre-planned scheme, the Appraisers took steps to obscure the inflated nature of the appraisals from Plaintiffs, the Class, and the IRS by intentionally omitting key facts from the appraisals.

59.     Once the IRS began scrutinizing the fraudulent Appraisals and other defects, they determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations.  Now that the United States government has begun peeling back the layers of fraud underpinning the SCE Strategy, it has initiated enforcement actions and conducted criminal prosecutions related to nearly identical transactions implemented by other promoters of the SCE Strategy. *See, e.g., United States v. Zak, et al.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers of other SCE Strategy transactions, seeking permanent injunctions halting these transactions and seeking to disgorge defendants of their ill-gotten gains); *United States v. Stein Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20- CR-129 (W.D.N.C.) (same).

**Defendants Solicit Dr. Juan's Investment in the Hematite SCE Strategy.**

60.     In early 2018, Dr. Juan and other members of Plaintiffs' Class received materials from Defendants' representatives via email about participating in the SCE Strategy through

Hematite Partners LLC (the "Hematite Syndicate"), a company formed and managed by an OSI affiliated entity ("Promotional Materials").

61.     The Promotional Materials invited potential participants, including Dr. Juan, to purchase an ownership interest in the Hematite Syndicate and informed them that the Hematite Syndicate would, in turn, purchase an ownership interest in Hematite Aggregates LLC (the "Hematite PropCo").

62.     The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Hematite Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code.

63.     Defendants (either directly or indirectly) promised, represented to, and assured the Plaintiffs and the Class that these tax deductions from the SCE Strategy were in full compliance with Section 170(h) of the Code and all other relevant and applicable laws, rules and regulations. They were not.

64.     The sole purpose of the Promotional Materials, which Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Hematite Syndicate, thus generating enormous fees for the Defendants and Other Participants.

65.     The Promotional Materials showed a robust team of licensed professionals who assisted with the evaluation of the enclosed business plan, appraisal of the Property, and overall SCE Strategy,

66.     It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex tax matters and tax planning. Indeed, that is why Plaintiffs and members of the Class relied on and trusted the Defendants and their team

of purported experts. Plaintiffs and the Class detrimentally relied on Defendants and the Other Participants and upon Defendants' and the Other Participants' repeated unequivocal representations that the SCE Strategy was a completely legal tax- advantaged charitable contribution within the meaning of Code § 170(h), which specifically provides that conservation easements, if done properly and legally, create legitimate charitable contributions for income tax purposes

## CLASS ACTION ALLEGATIONS

67.     The Defendants also convinced what is believed to be several hundred of other clients (throughout the United States and in particular in the State of Florida) to execute the SCE Strategy. For these Class Members, the IRS has now indicated it will disallow the charitable deductions and, in most instances, has already disallowed the deductions at the partnership level as well as its intent to disallow them at the individual level.

68.     Upon information and belief, there were only minor, if any, variations in the misrepresentations by the Defendants about the effect of applicable tax law standards to the members of the Class. And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and, most importantly, the fraud and misrepresentations by the Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate. Thus, the Defendants were not simply negligent; they engaged in a pre-planned fraudulent scheme in which all Defendants and others participating knew that the SCE Strategy, as structured and implemented, would fail if challenged by the IRS, despite the Defendants' repeated representations to the contrary.

## RICO ALLEGATIONS

69.     Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c).

70.     At all times relevant hereto, each of Plaintiffs and the Defendants and Other Participants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

71.     To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their pre- planned scheme to convince clients to participate in the SCE Strategy. Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed. This association of entities and individuals to structure, promote, sell, and implement the SCE Strategy thereby constitutes a racketeering enterprise.

72.     This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to back-taxes, interest and penalties, lose the substantial tax benefits that would have resulted from a properly implemented conservation easement transaction, and incur additional accounting and legal fees and expenses to deal with the IRS fallout, all resulting from Plaintiffs and the Class claiming charitable contribution deductions on their federal and state tax returns based on the fraudulent and defective SCE Strategy and the Defendants' advice, recommendations, and assistance in connection therewith

**Enterprise**

73.     An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

74.     In this case, the enterprise ("Enterprise") for RICO and Florida RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that associated to solicit persons to participate in the fraudulent SCE Strategy for the purpose of

generating and sharing fees and commissions derived from the SCE Strategy and alleged tax liability reduction it purported to provide.

**Predicate Acts**

*Criminal Wire Fraud: Violation of 18 U.S.C. § 1343*

75.    In or about and between 2018 and continuing to this day, within the Southern District of Florida - Miami Division and elsewhere, the Defendants together with members, participants and wrongdoers of a criminal enterprise, did knowingly, intentionally, and willfully conspire to use and employ manipulative and deceptive devices and contrivances and directly and indirectly *(1)* employ devices, scheme and artifice to defraud third party investors; *(2)* to make untrue statements of material facts and omit facts to state facts necessary in order to induce those fraudulent investments; and *(3)* to engage in acts, practices and courses of conduct which would and did operate as a fraud and deceit upon the third party investors, in connection with the fraudulent scheme, and by use of the instruments of communication interstate commerce and the mails, all in violation of Title 18 U.S.C. §§1341, 1343 and 2.

76.    In their operation and control of the Enterprise, including the failure to disclose the true purpose of solicited investments in the Company, the Insiders carried out an undisclosed scheme to embezzle money from third-party investors through numerous violations of the federal criminal wire fraud statute.

77.    All of the fraudulent investments were perpetrated by the Defendants' simultaneous violation of fiduciary obligations of trust and loyalty and avoidance of conflicts that they owed to Plaintiffs.

78.    Accordingly, the activities of the Insiders, as described in this Complaint, formd a pattern of numerous related violations of the criminal wire fraud statute.

*Money Laundering: Violation of Title 18 U.S.C. § 1957*

79.    18 U.S.C. § 1957 provides criminal penalties for a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

80.    In or about and between 2018 and continuing to this day, within the Southern District of Florida - Miami Division and elsewhere, Defendants, together with others unknown and members of a criminal enterprise, knowingly and intentionally engaged in monetary transactions in criminal derived property that was of value greater than $10,000.00 and was derived from specified unlawful activity, to-wit: wire fraud, securities fraud, common fraud, fraudulent conveyance or conversion of property, felony theft, by defrauding third party investors with the use various federal insured financial institutions, all in violation of Title 18 U.S.C. §§ 1957 and 2.

81.    Defendants used the various entities to violate § 1957, in that they knowingly engaged, as described in this Complaint, in numerous transactions involving the interstate transfer of funds by wire in criminally deprived property, each in the amount greater than $10,000, which were in fact proceeds of specific unlawful activitiy—to wit, wire fraud, securities fraud, bank fraud, interstate and foregin transportation in aid of racketeering enterprises, as further described herein.

*Interstate and Foreign Transportation In Aid of Racketeering Enterprises*
*Violation of 18 U.S.C. § 2314*

82.    Among the numerous predicate acts committed by the Insider Defendants were violations of 18 U.S.C. § 1952, which makes it a federal crime to use any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity. As described throughout this Complaint, the Insiders violated this provision by using facilities of interstate commerce in the form of bank wire transfers, with the intent to distribute those proceeds of

unlawful activites of money laundering under 18 U.S.C. § 1957, and to promite, manage, establish and carry on, and to facilitate, the promotion, management establishment, or carryon on, of this unlawful activity of money laundering in violation of the aforementioned statute.

83.     These same acts permitted, carried on, and facilitated the promotion and carryon on of money laundering by effecting transfers to, from, and through the Enterprise in the carrying out of the scheme or schemes to defraud and the Enterprise.

*Interstate and Foreign Transportation of Stolen Monies*
*Violation of 18 U.S.C. § 2314*

84.     The Insiders also committed numerous predicate acts in violation of 18 U.S.C. § 2314, in that they transferred, in interstate commerce as described herein, through banks, money in the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.  These transfers were effected pursuant to a scheme to embezzle.

85.     In or about and between 2018 and continuing to this day, within the Southern District of Florida - Miami Division and elsewhere, the Defendants, together with members of the enterprise and others unknown, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did knowingly, and intentionally conspire to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to-wit: mail and wire fraud, securities fraud, theft, common fraud, felony theft, fraudulent conveyance or conversion of property, *(1)* with the intent to promote the carrying on of the specified unlawful activity and *(2)* knowing that the transactions were designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of such proceeds, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), all in violation of Title 18, United States Code, Section 1956(h) and 2.

86.     As a direct and result of the foregoing, Plaintiffs have been harmed.  In addition to actual damages as a result of these unlawful and fraudulent activities, Plaintiffs are entitled to treble damages and an award of attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Scienter**

87.     Defendants misrepresented and omitted material facts about the purported tax benefits of investing in the SCEs, the ability to realize those benefits, the true fair market value of the properties that would be encumbered, and other things.  Defendants knew or were recklessly indifferent to the true state of affairs and that the statements were made with an intent to deceive, manipulate, or defraud.

88.     Defendants had access to information (both public and proprietary) which contradicted their client-facing statements but were deliberately withheld from Plaintiffs in order to further the misconduct alleged herein.

89.     The statutory safe harbor for 'forward looking' statements under certain circumstances does not apply to the statements and representations described in this Complaint, which were not forward looking when made.  For the most part, the statements were (mis)representations of present fact, or representations of law made by persons of authority who held themselves out as experts, but who financially benefitted from Plaintiffs reliance thereon.  To the extent the safe harbor does apply, Defendants are still liable because, at the time such statements were made, the person making them was making them with criminal intent or at the direction of a person with criminal intent.

**Timeliness of Plaintiffs' Claims**

90.     Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein shortly before the filing of this lawsuit.

91.     In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

**The Final Hook: Jason Brown's March 19, 2019 E-Mail and Dr. Juan's Reliance Thereon**

92.     In late March 2019, Dr. Juan reached out to Defendant Jason Brown.

93.     Therein, the two agreed to speak by phone.

94.     On March 19, 2019, and ahead of that call, Dr. Juan specifically inquired of the Defendants:

> *I do not mean to doubt your firm, but I am not an investment expert. I want to be assured that the investment I made is in full compliance with IRS rules and regulations.*

95.     Defendant Jason Brown (on his own behalf and on behalf of all of the Defendants) almost immediately responded the same day:

> *All of our offerings are in full compliance with IRS rules and regulations. As I had mentioned previously, this is the main reason why we have 3 in house tax attorneys on staff with us. One of those tax attorneys worked as a senior counsel for the IRS for 10 year prior to joining our firm.*

96.     This representation of legal compliance was woefully false.

97.     As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and interest, and have paid significant professional fees in connection with the IRS disputes.

**Defendants Unlawfully Deterred Plaintiffs' From Bringing This Action**

98.     Plaintiffs were fraudulently delayed and deterred from bringing their claims against Defendants at an earlier date, *inter alia*, based upon the following communications from Defendants, which served to reassure Plaintiffs about the legality of their SCE Strategy transactions and deductions and/or which delayed Plaintiffs from filing a lawsuit.

**Defendants Provided Unlawful Tax Advice**

99.     Defendants were Dr. Juan's tax advisors.

100.    Defendants, individually and collectively, worked with accounting firms and accountants also were a key part of the conspiracy alleged herein (the "Return Preparers")

101.    The Return Preparers prepared the partnership tax returns for the Syndicates used in the SCE Strategy, as well as the Schedule K-1s ("K-1s") that were issued to each of the Plaintiffs and members of the Class containing what the Return Preparers represented to the IRS, under penalties of perjury, was their proportionate share of their respective Syndicate's charitable contribution deduction resulting from the SCE Strategy.

102.    The Return Preparers prepared the K-1s with the intent that each Plaintiff and member of the Class would utilize their respective K-1 to claim the grossly exaggerated charitable contribution deduction from the SCE Strategy. The Return Preparers instructed Plaintiffs and members of the Class to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns; indeed, Plaintiffs and members of the Class were required to do so by applicable Federal law. Furthermore, the impact of the items from the K-1 on each of Plaintiff's tax returns was so substantial that the Return Preparer for that K-1 and corresponding entity return would be deemed under Federal law as that Plaintiff's "tax return preparer," regardless of whom entered the item on the Plaintiff's Form 1040 or schedules

103.     In fact, Defendants directed the Return Preparers to prepare and send to Dr. Juan his K-1s.

104.     However, the IRS began scrutinizing the fraudulent Appraisals and other defects, and determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations.

105.     From 2018 through the present, some or all of the Defendants provided information which, when sent to Plaintiff and other Class membersas part of his tax preparation, contained material misrepresentations and/or omissions, including but not limited to:

    a.   The treatment that Plaintiffs would receive from charitable contributions made for tax purposes

    b.   The tax deductability and qualification of Plaintiffs' charitable contribution

    c.   The appropriateness, data, and methodology of the appraisals commissioned by the Defendants; and

    d.   The compliance with various IRS and Treasury regulations

106.     All conditions precedent to filing this action have either occurred or been waived by Defendants' conduct and course of dealing.

## COUNT I: VIOLATIONS OF FEDERAL CIVIL RICO STATUTE
### (18 U.S.C. § 1962(c)) – against all Defendants

107.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

108.     18 U.S.C. § 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

109.   Plaintiffs are "persons" within the meaning of Title 18 U.S.C. §§ 1961(3) and 1964(c).

110.   The Defendants are "persons" within the meaning of Title 18 U.S.C. §§ 1961(3) and 1964(c)

111.   At all times of the activities referred to in this Complaint, Defendants formed an association-in-fact for the purpose of orchestrating tax fraud against Plaintiffs. This association was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

112.   At all relevant times, the Enterprise was engaged in and its activities affected interstate and foreign commerce in the manner described herein.

113.   Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of significant sums of money. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

114.   Defendants, using their positions of control over the SCE, caused interstate wires to be made in violation of federal law, which transfers had the direct effect of causing inuury to the unsuspecting victims of their fraud across the country.

115.   This pattern was extensive, covering a period over a year and, upon information and belief, continues through the present (since Dr. Juan has not been able to divest his ownership and control in the partnership.

116.    The Defendants perpetrated this criminal enterprise throught their control over the corporate Enterprise and its assets.

117.    With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce

118.    Defendants regularly communicated with one another and third parties, including with Dr. Juan and other Class members, via interstate wire communications (i.e., email correspondence, and phone calls) in furtherance of their fraudulent scheme.

119.    At all relevant times Defendants with others known and unknown were associated in fact and constituted an enterprise engaged in the and the activities of which affected, interstate and foreign commerce within the meaning of Title 18 U.S.C. §§ 1961(4) and 1964(c), and did conduct or participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity within the meaning of inter alia 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, et seq.

120.    Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

121.    As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive

damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT II: CONSPIRACY TO VIOLATE FEDERAL RICO STATUTE
### 18 U.S.C. § 1962(c) – Against All Defendants

122.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

123.     This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

124.     Section 1962(c) of RICO provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (1), (b), (c) of this section."

125.     From at least 2018 and continuing to this day, each of the Defendants, in violation of 18 U.S.C. § 1962(d), unlawfully and willfully combined, conspired, confederated and agreed to violate 18 U.S.C. § 1962(c), and conducted and participated, directly and indirectly, in the conduct of the affairs of the Enterprise as alleged herein.

126.     In furtherance of the above-described conspiracy, and to affect its objectives, the participants in the enterprise committed and agreed to commit overt acts or have others commit overt acts on their behalf in the Southern District of Florida - Miami Division and elsewhere.

127.     The Defendants and participants did conspire to conduct or participate, directly or indirectly, in the conduct of such Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) (A), (B), (D) & (E) and 1961(5) and 1962(c), to-wit:

(a)     Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;

(b)     Multiple instances of money laundering in violation of Title 18 U.S.C. §§ 1956 and 1957.

(c)      Multiple instances of interstate transportation of persons and of stolen property in violation of 18 U.S.C. § 2314;

128.    Absent Defendants' conspiracy and joint efforts with their co- conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

129.    Defendants knew or should have known that their predicate acts as described in this Complaint were part of a pattern of racketeering activity, and did agree with each other unknown persons to the commission of those acts to further the scheme to defraud and to commit the violations of federal criminal law described in this Complaint, and did commit overt acts in furtherance thereof.  The conspirators' conduct constitutes violations of 18 U.S.C. § 1962(d).

130.    Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

131.    By reason of violation of 18 U.S.C. § 1962(d) committed by the Defendants aforenamed, the Plaintiff was injured and sustained a loss, within the meaning of 18 U.S.C. § 1964(c), in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT III: VIOLATION OF FLORIDA RICO STATUTE
### Against All Defendants

132.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through

106 as if fully set forth herein.

133.     Beginning in or about 2018 and continuing to the present day, the Defendants,

who were associated with the Enterprise through their ownership and/or control of the SCE

entities, engaged in an extensive pattern of activities that are and were subject to indictment as

criminal offenses listed in 18 U.S.C. § 1961(1) for violations of the provisions of federal criminal

law described as having been committed by them in Counts I and II above.

134.     Through the pattern of criminal activity described throughout this Complaint, the

Defendants, acting with criminal intent, have directly and indirectly received the benefits from

their criminal activity, committed violations of § 772.103(1)–(3) and § 772.103(4), Fla. Stat.

135.     As a direct and proximate result of the Defendants' criminal conduct in violation

of § 772.103, Fla. Stat., those members of the Class in Florida have been injured and sustained

damages in an amount to be proved at trial.  Further, such Class members are entitled to treble

damages and an award of attorneys' fees and costs pursuant to Fla. Stat. §772.104(1)

**WHEREFORE**, Plaintiffs who qualify for this sub-Class respectfully request judgment in

their favor and against Defendants, for actual, consequential and incidental damages; treble

damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law;

attorneys' fees and costs; punitive damages to be determined at trial; and such other and further

relief which the Court deems just and proper.

## COUNT IV: COMMON LAW NEGLIGENCE
### Against All Defendants

136.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through

106 as if fully set forth herein.

137.    As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care. Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

138.    Defendants failed to meet their applicable standards of care.

139.    Defendants' failure to meet their respective standards of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

140.    Defendants' failures to meet the applicable standards of care constitute negligence.

141.    Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class. In reasonable reliance on the Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

142.    Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Defendants, jointly and severally.

143.    Defendants' negligence/gross negligence proximately caused damages to Plaintiffs

and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

144.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT V: NEGLIGENT MISREPRESENTATION
### Against All Defendants

145.    Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

146.    During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count IX below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class. In addition, each Defendant is liable for each negligent misrepresentation and omission made by each

of their co-conspirators.

147.     Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong. Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

148.     As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants owed Plaintiffs and the members of the Class a duty to correctly state all facts regarding the SCE Strategy. Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

149.     Plaintiffs and members of the Class reasonably relied upon the Defendants' misrepresentations and advice.

150.     The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class. In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2) paid substantial fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS

audits and Tax Court proceedings.

151.    The Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy,(2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT VI: BREACH OF FIDUCIARY DUTY
### Against All Defendants

152.    Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

153.    As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants became fiduciaries of the Plaintiffs and the members of the Class. Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class. Thus, these Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable

codes of professional responsibility.

154.    These Defendants breached these duties and caused Plaintiffs and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

155.    These Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class. In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) failed to file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

156.    The Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

157.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial.

158.     As a result of these Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

159.     Accordingly, these Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount to be proven at trial.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT VII: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**Against All Defendants**

160.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

161.     As described more fully through this Complaint, each of the Defendants aided and abetted the breaches of fiduciary duty of each of the other Defendants and third parties. Each aiding Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

162.     Each of the aiding Defendants acted to procure the breach of the other Defendants' fiduciary duties through improper conduct and without privilege. Each of the aiding Defendants did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty. Each of the

aiding Defendants also acted purposely and with malice and the intent to injure. Each of the Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty and each of the aiding Defendants' tortious conduct proximately caused damage to the Plaintiffs.

163.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and third parties, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

164.    As a direct and proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages. Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial.

165.    Further, as a result of these Defendants' aiding and abetting the breach of fiduciary duties by others, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT VIII: FRAUD
### Against All Defendants

166.     Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

167.     In order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants and the Other Participants, Defendants directly and indirectly, through themselves and others, made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class, as set forth above and the following:

i.     Misstating, in light of published authorities and guidance from the IRS, the tax treatment Plaintiffs and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

ii.     Advising Plaintiffs and members of the Class that the donation of the conservation easement was tax deductible as a qualified charitable contribution deduction;

iii.     Advising Plaintiffs and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

iv.     Failing to advise Plaintiffs and members of the Class that the alleged value of the conservation easement and associated tax benefits in the SCE Strategy constituted a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

v.     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

vi.     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

vii.     Advising Plaintiffs and members of the Class that the appraisal commissioned by the

Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

viii.   Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants did not comply with §170 of the Code and regulations, and with general and substantive real property appraisal standards and practices;

ix.   Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

x.   Providing false valuation statements to Plaintiffs and members of the Class, including the fair market value of the conservation easement;

xi.   Advising Plaintiffs and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

xii.   Failing to advise Plaintiffs and members of the Class that the appraiser relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

xiii.   Failing to advise Plaintiffs and members of the Class that the appraiser incorrectly reached unsupportable and/or predetermined conclusions;

xiv.   Advising Plaintiffs and members of the Class that the Appraisals conformed with applicable law and regulation;

xv.   Failing to advise Plaintiffs and members of the Class that the Appraisals did not follow the law and applicable regulations because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

xvi.   Advising Plaintiffs and members of the Class that the Appraisals complied with the Code

and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

xvii.   Failing to advise Plaintiffs and members of the Class that the Appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

xviii.  Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

xix.    Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

xx.     Advising Plaintiffs and members of the Class that the property has specific conservation values that satisfy the Code;

xxi.    Failing to advise Plaintiffs and members of the Class that the property did not have specific conservation values that satisfy the Code;

xxii.   Advising Plaintiffs and members of the Class that the conservation easement restrictions complied with the Code requirement that they must be perpetual;

xxiii.  Advising Plaintiffs and members of the Class that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

xxiv.   Failing to advise Plaintiffs and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170

of the Code;

xxv. Advising Plaintiffs and members of the Class that the Appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

xxvi. Failing to advise Plaintiffs and members of the Class that the Appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

xxvii. Advising Plaintiffs and members of the Class that the highest and best of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it was not;

xxviii. Advising Plaintiffs and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not

xxix. Failing to advise Plaintiffs that the "before value" is unreasonable and is not an estimate of the fair market value as of the date of the valuation before the easement conveyance;

xxx. Advising Plaintiffs and members of the Class that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the other Defendants which resulted in an inflated fair market value of the conservation easement;

xxxi. Advising Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on

the income tax return was proper;

xxxii. Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

xxxiii. Failing to advise Plaintiffs and members of the Class that the subject of valuation was not financially feasible and, therefore, improper;

xxxiv. Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

xxxv. Failing to advise Plaintiffs and members of the Class that the Appraisals were not qualified appraisals under §170 of the Code because the highest and best use was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

xxxvi. Failing to advise the Plaintiffs and members of the Class that the Appraisals were not "qualified appraisals" under §170 of the Code.

xxxvii. Advising Plaintiffs and members of the Class that the conservation easement substantiated a valid conservation purpose;

xxxviii. Advising Plaintiffs and members of the Class that the Baseline Documentation Report supported a valid conservation purpose on the property;

xxxix. Failing to advise Plaintiffs and members of the Class that the Baseline Documentation Report did not support a valid conservation purpose on the property;

xl. Advising Plaintiffs and members of the Class that a Deed of Conservation would permit activity that is consistent with a valid conservation purpose, including preserving habitat

and open space;

xli. Failing to advise Plaintiffs and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid conservation purpose and therefore did not qualify for a federal charitable deduction;

xlii. Advising Plaintiffs and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

xliii. Failing to advise Plaintiffs and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

xliv. Advising Plaintiffs and members of the Class to report the charitable contribution deduction on their individual tax returns;

xlv. Advising Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was proper and accurate and should be used to report the deduction on their individual return;

xlvi. Failing to advise Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

xlvii. Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based on the fair market value of the conservation easement determination in the appraisal;

xlviii. Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

xlix. Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a

conspiracy to design, market, sell, and implement the SCE Strategy.

168.    The above affirmative misrepresentations and/or intentional omissions of material fact made by Defendants were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and the Other Participants. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and Other Participants.

169.    In reasonable reliance on the false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy.

170.    But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed

to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

171.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT IX: RECISSION
*Pled in the Alternative*

172.    Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

173.    In connection with the SCE transactions, Plaintiffs and members of the Class were provided with documents purporting to disclaim or limit the rights of Plaintiffs and members of the Class.  In deciding to engage in the SCE transactions, Plaintiffs and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact made to Plaintiffs and members of the Class, including but not limited to those set forth (or incorporated) elsewhere in this Complaint. Had the Defendants not made those

misrepresentations or omissions, Plaintiffs and members of the Class would not have engaged in the SCE transactions. Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them. Further, the concealment is of intrinsic qualities of the features of the SCE Strategy (such as, highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE satisfied Code 170 and regulations promulgated thereunder) which the Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to Federal tax consequences, under well-established law had no duty to seek to discover. Alternatively, the Recission Defendants had a duty to disclose these matters.

174.    Thus, the Defendants fraudulently induced Plaintiffs and members of the Class to enter into the SCE transactions in furtherance of the conspiracy between and among the Rescission Defendants.

175.    Plaintiffs and members of the Class seek rescission of all agreements they entered into and all documents they received in connection with entering into the SCE transactions ("Rescission Agreements").

176.    Plaintiffs had no duty to rescind before filing, nor to restore any consideration because it would be unreasonable to require them to do so, if not impossible.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for recission of the Rescission Agreements; attorneys' fees and costs; and such other and further relief which the Court deems just and proper.

## COUNT X: CIVIL CONSPIRACY
### Against All Defendants

177.    Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

178.     As described more fully above, the Defendants knowingly acted in concert to design, market, sell, and implement the SCE Strategy. In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class. In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

179.     The Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees.

180.     Defendants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or third party made to Plaintiffs and members of the Class.

181.     The acts of the Defendants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

182.     There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to Plaintiffs and members of the Class. The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to

cause damages to Plaintiffs and members of the Class as previously set forth herein.

183.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and third parties, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT XI: UNAUTHORIZED PRACTICE OF LAW
### (VIOLATION OF FLA. STAT 454.23)

184.    Plaintiffs repeats and realleges the allegations contained in paragraph 1 through 106 as if fully set forth herein.

185.    Section 454.23 of the Florida Statutes provides:

Any person not licensed or otherwise authorized to practice law in this state who practices law in this state or holds himself or herself out to the public as qualified to practice law in this state, or who willfully pretends to be, or willfully takes or uses any name, title, addition, or description implying that he or she is qualified, or recognized by law as qualified, to practice law in this state, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

186.    Defendant Jason Brown (on his own behalf and on behalf of all of the Defendants) made the following representation to Plaintiff:

> *All of our offerings are in full compliance with IRS rules and regulations. As I had mentioned previously, this is the main reason why we have 3 in house tax attorneys on staff with us. One of those tax attorneys worked as a senior counsel for the IRS for 10 year prior to joining our firm.*

187.     Defendant Jason Brown, (on his own behalf and on behalf of all of the Defendants) through his course of dealing with Plaintiff and other similarly situated Class Members, held himself out as authorized to practice law in the State of Florida

188.     Defendant Jason Brown, (on his own behalf and on behalf of all of the Defendants) through his course of dealing with Plaintiff and other similarly situated Class Members, engaged in the unauthorized practice of law in the State of Florida by, inter alia, opining on compliance with IRS rules and regulations.

189.     Plaintiff and other similarly situated Class members relied (in whole or in part) on similar representations and opinions of law expressed by Jason Brown.

190.     As a result, Plaintiff and similarly situated Class members have been damaged.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre- and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated: November 12, 2024

Respectfully submitted,

**PARDO LAW PLLC**
*Lead Counsel for Plaintiff*
1205 Lincoln Road, Suite 211
Miami Beach, Florida 33139
Telephone: (305) 308-7388
Email: joe@pardolawmiami.com

By: */s/ Joseph I. Pardo, Esq.*
      Joseph I. Pardo, Esquire
      Florida Bar No. 1003339


and


**BizTx Law, P.A.**
*Co-Counsel for Plaintiff*
11940 S Baypoint Cir
Parkland, FL 33076
Tel: (954) 824-1997
Fax: (954) 689-2826
Email: asmith@biztxlaw.com

By: */s/ Adam J. Smith, Esq.*
      Adam J. Smith, Esquire
      Florida Bar No. 100024

## **VERIFICATION**

Under penalty of perjury, I declare that I have read the foregoing Verified Complaint and the facts alleged therein are true and correct to the best of my knowledge and belief.

By: _____

Name: Pedro E. Juan