**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO.:  24-81421-CIV-DIMITROULEAS**

PEDRO E. JUAN, on his own behalf
    and all others similarly situated,

                 Plaintiffs,

v.

HEMATITE LAND PARTNERS LLC;
HEMATITE AGGREGATES LLC;
PARTNERSHIP REPRESENTATIVE
    MANAGEMENT LLC;
ORNSTEIN-SCHULER GROUP LLC;
ORNSTEIN-SCHULER INVESTMENTS LLC;
ORNSTEIN-SCHULER CAPITAL PARTNERS LLC;
WEIBEL & ASSOCIATES, INC.;
ECOVENTURES LLC;
GALT MINING LLC;
and JASON D. BROWN,

                 Defendants.

_____ /

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiff, PEDRO E. JUAN ("Dr. Juan"), on his own behalf and all others similarly situated

(the "Class") (collectively, "Plaintiffs"), hereby amends the Class Action Complaint against

Defendants, HEMATITE LAND PARTNERS LLC; HEMATITE AGGREGATES LLC;

PARTNERSHIP REPRESENTATIVE MANAGEMENT LLC; ORNSTEIN-SCHULER GROUP

LLC; ORNSTEIN-SCHULER INVESTMENTS LLC; ORNSTEIN-SCHULER CAPITAL

PARTNERS LLC; WEIBEL & ASSOCIATES, INC.; ECOVENTURES LLC; GALT MINING

LLC; and JASON D.  BROWN (collectively, "Defendants"), and states as follows:

## INTRODUCTORY STATEMENT

1.      This case involves a multi-year fraudulent scheme by a group of supposedly independent and respected financial investment professionals who knowingly conspired to develop, promote, sell and implement a tax-savings strategy, commonly known as a Syndicated Conservation Easement Strategy (the "SCE Strategy"), whereupon Defendants leveraged their expertise, experience, and reputation to induce Plaintiffs (and hundreds of other, similar clients across the United States) to participate in numerous transactions involving the SCE Strategy by promoting the SCE Strategy as a legitimate tax-savings product. By design, the SCE Strategy involved complex partnership structures and a series of steps that required specialized knowledge of conservation easements and highly technical tax laws and regulations. But beneath these complex structures hid the truth (which was purposefully obscured from Plaintiffs, other clients, and the Internal Revenue Service ("IRS")): the SCE Strategy was simply an attempt by Defendants to convey a substantial real estate interest to a co-conspiring charity, after fraudulently and grossly inflating the value of the real estate interests, and sell the corresponding tax deduction to Plaintiffs and other clients for lucrative professional fees.

2.      Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes. Indeed, part of the sales pitch to Plaintiffs was the goal of preserving valuable land for the greater public good.

3.      When properly valued and implemented, conservation easements can and do confer legitimate tax advantages to the donor in addition to environmental benefits to the public. When such easements are placed on property in strict compliance with Section 170(h) of the IRS Code (the "Code"),  donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.

4.      Under Section 170(h)(7)(A) of the Code, a contribution by a partnership "is not treated as a qualified conservation contribution for purposes of IRC Section 170 if the amount of such contribution exceeds 2.5 times the sum of each partner's relevant basis in such partnership, as defined in IRC Section 170(h)(7)(B)."

5.      As alleged herein, the SCE Strategy provided to Plaintiffs was not properly and legitimately valued or implemented and was never intended to be. The SCE Strategy also intentionally did not comply with Section 170(h) of the Code, and Defendants were on notice of such illegitimacy. In working together to implement the SCE Strategy, including drafting various documents necessary to implement the SCE Strategy, Defendants ignored controlling law and directives from the IRS. The Defendants wholly failed *inter alia* to satisfy the IRS's requirements for the Appraisals. The IRS requirements were clear and unambiguous, and the Defendants knew or should have known that (1) these crucial aspects of any conservation easement transaction failed to comply with the applicable requirements and law, and (2) each one of these failures, ***standing alone***, prevented the SCE Strategy from generating a legitimate and legal charitable contribution deduction from a conservation easement donation.

6.      Defendants handpicked the appraisers to be used for the SCE Strategy.  These appraisers (the "SCE Appraisers") cast aside their professional obligations and duties.  Each created sham Appraisals with grossly inflated valuations.  In each of the SCE Strategy transactions, the Promotional Materials contained identical language about the expected tax effects:

> **For every $1.00 of membership share cost, the new member would receive a charitable contribution deduction for approximately $4.39 ($4.38596 to be more exact) that should save the new member approximately $2.00 in taxes.**

7.      Each of the appraisals was conveniently able to deliver on the Promotional Materials' promise (uniform across all the transactions) by producing the fraudulently exaggerated

valuations that were big enough to result in a tax savings of $2 for every $1 invested.  All of the Defendants intended for these grossly inflated appraisals to be unknowingly used by the Plaintiff and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiff and the Class, were completely unsupportable and in violation of some of the most basic rules and concepts for land appraisals.

8 .     The appraisals were the lynchpin of the SCE Strategy and were egregiously inflated and defective to advance the goals of the scheme.  The most critical element of the bogus appraisals was an insupportable finding of Highest and Best Use ("HBU").  To concoct a HBU that would support the valuation that the Defendants sought, appraisers made false assumptions and ignored inconvenient facts that enabled them to determine a HBU for subject properties for which no objective and competent appraiser would concur.  The bogus HBU determined by appraisers relied on equally bogus land development and mining reports for the express purpose of assisting with SCE scheme.  These reports purported to provide a basis for developing the properties for development or mining purposes, when in reality the development consultants and other Defendants all knew that development or mining was not economically feasible.  The SCE scheme participants, including the Ornstein-Schuler Defendants described below, even created a lobbying organization called Partnership For Conservation, which was organized in part to disseminate falsehoods about valuation in connection with SCEs to "gaslight" the United States Congress, the IRS and most importantly, prospective investors.  In an article entitled "A Dirty Dozen Myths about Conservation Easements and One Sad Truth," *Tax Notes Federal, April 27, 2020*, by P4C Chair Robert Ramsay, he claims incredulously that "[a] conservation easement can have a higher value than the value of the land."  The improper HBU is belied by the false assumption that the property owner suffered "lost profits" arising from no alteration of the property.  All of the

foregoing chicanery causes the valuation of a property to be exponentially higher than allowed by the IRS under the "Willing Buyer Willing Seller" test. In one instance that is an excellent example of an outrageous valuation arising from a fictional HBU, appraisers valued a conservation easement at 62 times the value of the entire property arising from a sale that occurred only months earlier.  In another instance, appraisers set the fair market value of a property at $175 million when only a few weeks earlier the promoters of the SCE Strategy had purchased the property for $35 million.  This same property was part of a *larger* tract that was listed for just $12.6 million a year earlier.

9.      In accordance with the Defendants' pre-planned scheme, the SCE Appraisers took steps to obscure the inflated nature of the appraisals from Plaintiffs, the Class, and the IRS by intentionally omitting key facts from the appraisals (such as recent comparable listings, recent sales, and prior unsuccessful attempts to develop the land for the same use as set forth in the Appraisals). Defendants' IRS filings further obscured the fact that these alleged valuation increases took place over a short period of time by fraudulently "tacking" their holding period to that of the prior owner of the same property many years prior and disclosing this falsified, misleading information on Form 8283, which is to be signed by the appraiser under penalties of perjury and attached as a part of the Form 1065 partnership tax return to substantiate the charitable contribution deduction claimed.  The Appraisals, as well as all promotion of the artificially subdivided tracts to Plaintiffs and the Class, failed to disclose the common origin of the tracts or the brief period that the property had been owned by the OSI Defendants or related entity.

10.      Several accounting firms and accountants also were a key part of the conspiracy alleged herein (the "Return Preparers"). The Return Preparers prepared the partnership tax returns for the Syndicates used in the SCE Strategy, as well as the Schedule K-1s ("K-1s") that were

issued to each of the Plaintiffs and members of the Class containing what the Return Preparers represented to the IRS, under penalties of perjury, was their proportionate share of their respective Syndicate's charitable contribution deduction resulting from the SCE Strategy.  The Return Preparers prepared the K-1s with the intent that each Plaintiff and member of the Class would utilize their respective K-1 to claim the grossly exaggerated charitable contribution deduction from the SCE Strategy.  The Return Preparers instructed Plaintiffs and members of the Class to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns; indeed, Plaintiffs and members of the Class were required to do so by applicable Federal law. Furthermore, the impact of the items from the K-1 on each of Plaintiff's tax returns was so substantial[6] that the Return Preparer for that K-1 and corresponding entity return would be deemed under Federal law as that Plaintiff's "tax return preparer," regardless of whom entered the item on the Plaintiff's Form 1040 or schedules.

11.     Once the IRS began scrutinizing the fraudulent Appraisals and other defects, they determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations.  Now that the United States government has begun peeling back the layers of fraud underpinning the SCE Strategy, it has initiated enforcement actions and conducted criminal prosecutions related to nearly identical transactions implemented by other promoters of the SCE Strategy.  *See, e.g., United States v. EcoVest Capital Inc.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers of other SCE Strategy transactions, seeking permanent injunctions halting these transactions and seeking to disgorge defendants of their ill-gotten gains); *United States v. Stein*

*Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20- CR-129 (W.D.N.C.) (same).

12.     As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and interest, and have paid significant professional fees in connection with the IRS disputes.  Defendants also convinced what is believed to be over two thousand other clients to execute the SCE Strategy.  For these Class Members, the IRS has now indicated it will disallow the charitable deductions and, in most instances, has already disallowed the deductions at the partnership level as well as its intent to disallow them at the individual level.

13.     To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their pre- planned scheme to convince clients to participate in the SCE Strategy.  Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed.  This association of entities and individuals to structure, promote, sell, and implement the SCE Strategy thereby constitutes a racketeering enterprise.

14.     This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to back-taxes, interest and penalties, lose the substantial tax benefits that would have resulted from a properly implemented conservation easement transaction, and incur additional accounting and legal fees and expenses to deal with the IRS fallout, all resulting from Plaintiffs and the Class claiming charitable contribution deductions on their federal and state tax returns based on the

fraudulent and defective SCE Strategy and the Defendants' advice, recommendations, and assistance in connection therewith.

15.    There were only minor, if any, variations in the misrepresentations by the Defendants about the effect of applicable tax law standards to the members of the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and, most importantly, the fraud and misrepresentations by the Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate.  Thus, the Defendants were not simply negligent; they engaged in a pre-planned fraudulent scheme in which all Defendants and others participating knew that the SCE Strategy, as structured and implemented, would fail if challenged by the IRS, despite the Defendants' repeated representations to the contrary.

16.    As it came to be, the SCE Strategy was fatally flawed from the outset and was ultimately denounced by the IRS.

17.    This lawsuit seeks to hold Defendants liable for their misconduct.

**<u>PARTIES</u>**

18.    Plaintiff, DR. PEDRO E. JUAN, is an individual *sui juris* and a resident of Miami-Dade County, Florida.

19.    Defendant, HEMATITE LAND PARTNERS LLC ("Hematite Land"), is an Alabama limited liability company. Hematite Land owned in Morgan County, Alabama. *See* Offering Summary, attached as Exhibit "A.

20.    Defendant, HEMATITE AGGREGATES LLC ("Hematite Aggregates"), is an Alabama limited liability company. Hematite Aggregates is a "*company that intend[ed] to*

*purchase up to 98% of the Property Owner's membership interests." See* **Exhibit A**.[1]

21.     Defendant, PARTNERSHIP REPRESENTATIVE MANAGEMENT LLC ("PRM"), is a Georgia limited liability company. PRM "provides consulting services to the partnership as the partnership representative should the IRS audit the partnership."

22.     Defendant, ORNSTEIN-SCHULER GROUP LLC ("Ornstein-Schuler"), is a Georgia limited liability company. Ornstein-Schuler company that "specializes in private equity investments in real estate and the company and its affiliates have been investing in real estate since 2002*." See* **Exhibit A**.

23.     Defendant, ORNSTEIN-SCHULER INVESTMENTS LLC ("OSI"), is a Georgia limited liability company with its principal place of business in Atlanta, Georgia

24.     Defendant, ORNSTEIN-SCHULER CAPITAL PARTNERS LLC ("OSCP"), is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Ornstein-Schuler, OSI, and OSCP are collectively referred to herein as the "OSI Defendants."

25.     Defendant, WEIBEL & ASSOCIATES, INC. ("Weibel"), is a corporation organized and existing under the laws of Georgia with its principal place of business in Tucker, Georgia. As discussed below, Weibel provided appraisal services that included conclusions about the highest and best use of the property and were otherwise used by Defendants for improper purposes. *See* **Exhibit A**.

26.     Defendant, ECOVENTURES LLC ("Ecoventures") is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Ecoventures is a consultant that "consults with land owners, companies and other parties in an effort to enhance and evaluate the

---

[1]   Attached hereto as **Exhibit A** is a copy of the Ornstein-Schuler Group's 2018 Offering Summary for Hematite Land Partners LLC.

benefits of land investment and ownership; and to help land owners evaluate the benefits of land conservation." *See* **Exhibit A**.

27.     Defendant, GALT MINING LLC ("Galt Mining") is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Galt Mining "consults with land owners and other parties on evaluating the benefits of developing and utilizing property for mining and mineral resource extraction." *See* **Exhibit A**.

28.     Defendant, JASON D. BROWN ("Brown"), is an individual *sui juris* and a resident of Georgia. Since 2016, Brown has been an employee and Vice President of Investments for OSI.

29.     Ornstein-Schuler, Ecoventures, Galt Mining and PRM worked with Hematite Aggregates, as property owner, and Hematite Land, as investor. *See* **Exhibit A**.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction action inasmuch as it asserts a federal question.

31.     18 U.S.C. § 1964 provides a civil cause of action for violations of 18 U.S.C. 1962.

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class (named or unnamed) is a citizen of a state that is different from at least one Defendant's state of citizenship.

33.     The aggregate amount in controversy exceeds $75,000.00.

34.     In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq.*; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and

Page 11                                              CASE NO.:  24-81421-CIV-DIMITROULEAS

conspiracy claims.

35.     This Court has personal long arm jurisdiction over Defendants pursuant to § 48.193(1)(a)(2), Florida Statutes, because, as described in greater detail below, Defendants committed tortious acts against Plaintiffs within this District and/or committed tortious acts outside of this District causing injury in this District to Plaintiffs and thereby submitted themselves to the jurisdiction of the courts of this State.

36.     Without limitation, each Defendant (directly or indirectly) has:

    a.     transacted business in Florida;

    b.     contracted to supply or obtain services in Florida;

    c.     availed themselves intentionally of the benefits of doing business in Florida;

    d.     produced, promoted, sold, marketed, and/or distributed their products or services in Florida and, thereby, have purposefully profited from their access to markets in Florida;

    e.     caused tortious damage by act or omission in Florida;

    f.     caused tortious damage in Florida by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

    g.     committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in

**Pardo Law PLLC · 1205 Lincoln Road · Suite 211 · Miami Beach, Florida  33139**

Florida to Plaintiff and members of the Class while (i) regularly

doing or soliciting business in such jurisdiction, and/or (ii) engaging

in other persistent courses of conduct within such jurisdiction, and/or

(iii) deriving substantial revenue from goods used or consumed or

services rendered in such jurisdiction;

h.      engaged in a conspiracy with others doing business in Florida that

caused tortious damage in Florida; and/or

i.      otherwise had the requisite minimum contacts with Florida such

that, under the circumstances, it is fair and reasonable to require

Defendants to come to Court to defend this action.

37.     Personal jurisdiction over Defendants meets the minimum contacts or due

process requirements such that the exercise of jurisdiction would not offend traditional notions

of fair play and substantial justice because modern methods of transportation and

communication (*e.g.*, Zoom and other video conferencing platforms) reduce significantly any

burden on Defendants to litigate in the State of Florida; and because The State of Florida has a

strong interest in seeing this matter resolved in Florida, as the dispute involves services

performed by out-of-state companies to a Florida company.

38.     Venue is proper under 28 U.S.C. § 1391, because, inter alia, a substantial part of

the events or acts giving rise to the causes of action alleged in this Amended Class Action Complaint

arose in, among other places, this District, and the harmful effects of Defendants' fraud and

wrongful conspiracy were felt in, among other places, this District.

## FACTUAL BACKGROUND

### A.      The History and Purpose of Conservation Easements

39.      A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

40.      In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

41.      A "qualified conservation contribution" is defined as a contribution (a) of a qualified real property interest, (b) to a qualified organization, (c) made exclusively for conservation purposes. Before a deduction can be claimed, however, certain criteria must be met. As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

### B.      The Government's Historical And Repeated Warning Related To Conservation Easements

42.      As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122). The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property. Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  Because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive

charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS. Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

43.      Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA"). DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under § 170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under § 170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

44.      The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA § 155(a). The relevant regulation reiterates that no deduction under IRC § 170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

45.      These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable

deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

46.     On July 12, 2004, the IRS released IRS Notice 2004-41, which officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including inter alia, failure to substantiate the fair market value of the tax benefit and other valuation issues. At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

47.     In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

**C.     The Rampant Use And Solicitation Of Conservation Easements By Ornstein-Schuler**

48.     Between 2012 and 2018, Ornstein-Schuler was engaged in the solicitation of several conservation easements, aggressively promoted (and heavily profit from) such conservation easements.

49.     Eventually, Defendants moved into soliciting *syndicated* conservation easements, which greatly expanded the purported market for the easements by making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

50.     Defendants' SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (the "Syndicates"). To achieve this end, Defendants formed the Syndicates as limited liability companies ("LLCs") under state law, which are taxed as a partnership (*i.e.*, a pass-through entity) for federal tax purposes. Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate in a conservation easement transaction.

51.     An entity taxed as a partnership (like an LLC) is not liable for income tax. Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to the partners from the partnership. Under the Code, charitable contributions are one item that flow through to the individual partners.

52.     Although a partnership does not pay federal income tax, it still has filing and reporting requirements. Specifically, a partnership is required to file an annual return on Form 1065 that reports the partnership's income, deductions, gain, losses, etc. The partnership is also required to furnish statements, called K- 1s, to its members (with copies to the IRS) that report inter alia each member's distributive share of partnership income or loss and separately stated items.

53.     The members are then required to report on their individual tax returns their share of the partnership income, loss and/or separately stated items, as they are contained on K-1s provided to them by the partnership. In the case of the SCE Strategy, Plaintiffs (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the K-1 they received from the respective Syndicate in which they were a member, as required by law.

54.     Accounting firms and accountants prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to Plaintiff and members

of the Class that set forth each individual's proportionate share of the Syndicate's charitable

contribution to be reported on their individual tax returns, as discussed further herein, in

furtherance of and pursuant to the conspiracy between all of Defendants (the "Return Preparers").

These firms/accountants prepared this partnership tax returns and K-1s with full knowledge of the

fact that these documents were being used in connection with the SCE Strategy and would result

in the Plaintiffs and members of the Class claiming charitable contribution deductions from the

SCE Strategy on their individual tax returns.

55.     Here, Defendants planned the steps of the SCE Strategy in advance and these steps

were uniform across for Plaintiffs in virtually every material way:

a.     First, a "Sponsor" (*e.g.*, OSI or an affiliate) obtains a majority interest
in property from a third-party ("Landowner"). This is accomplished
through a series of steps: (1) the Sponsor creates a limited liability
company ("PropCo"); (2) at the time PropCo is formed, Landowner
is the 100% owner of PropCo and Landowner then deeds land into
PropCo; and (3) the Sponsor (or its affiliate) purchases a majority
interest (usually around 98%) in PropCo from Landowner.

b.     Second, prior to completing the purchase of the majority interest,
the Sponsor (or its affiliate) conducts a "due diligence" period
during which it obtains an initial appraisal ("Initial Appraisal") of
the land from one of its hand-picked appraisers (the "Primary
Appraiser") and engages a consultant (*e.g.*, a mining engineer, land
development consultant, and/or conservation consultant) to assess
the land for its alleged intended purpose, as explained below. The

Initial Appraisal purports to provide a valuation based on the HBU of the land. The Primary Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiff and members of the Class. During the due diligence period, other consultants purportedly assist with conservation management, determining the HBU of the Property, and perform other services in connection with and support of the "Conservation Easement Option."

c.      Third, the Sponsor (or its affiliate) hires a consulting firm or consulting firms to purportedly evaluate the potential for development of the Property, which was never economically viable but was used later by the Appraisers to arrive at an overstated HBU.

d.      Fourth, the Sponsor (or its affiliate) forms a second limited liability company (the "Syndicate") and sends marketing materials (the "Promotional Materials") to potential participants. These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy. In the Promotional Materials, Defendants also specifically tout the tax benefits of a conservation easement for potential participants (the "Conservation Easement Option"), improperly promising them a legal return of more than 2.5 times the amounts paid into the Syndicate(s).

e.    Fifth, after the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but 0.5% of its interest in PropCo to the Syndicate in exchange for cash. The end result is PropCo (which holds the critical property) is owned 97.5% by the Syndicate, 0.5% by the Sponsor (or its affiliate), and 2% by Landowner.

f.    Sixth, the Sponsor (or its affiliate) obtains a second appraisal or an appraisal review from another one of its hand-picked appraisers ("Secondary Appraiser") (the Primary Appraisers and Secondary Appraisers are included within the definition of "SCE Appraisers" set out supra). Once again, the appraisals obtained by the Sponsor (or its affiliate) purport to value the land at its HBU.

g.    Seventh, Defendants prepare a Conservation Easement Deed.

h.    Eighth, Defendants prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

i.    Ninth, PropCo then donates a conservation easement to a land trust (the "Land Trust") and the remaining fee simple interest in the land to an affiliate of the Land Trust, thus allowing the Sponsor to not have any continuing obligation with respect to the remaining partnership assets.

56.    The value of the donation is reported as a charitable contribution deduction on the Syndicate's tax return (prepared by the Return Preparers). The amount of the charitable

contribution deduction reported on the Syndicate's tax return equals the purported decrease in the property's appraised value resulting from the alleged restriction placed on the property by virtue of the conservation easement. This deduction is then allocated to each Syndicate member based on their respective ownership interests in the Syndicate. Each Syndicate member reports their allocated deduction on their individual tax return as reflected in the K-1 they receive from the Syndicate's tax preparer.

57.     In reality (and unbeknownst to Plaintiffs), the SCE Strategy, as developed, structured and implemented by some or all Defendants, amounts to nothing more than a sale of grossly overvalued and ineffectively structured federal tax deductions that the IRS was already carefully scrutinizing and indicating to professional advisors it would disallow.

58.     In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price. In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions. Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

59.     Based on the foregoing, Defendants were on notice as early as 2017 that their SCE Strategy was likely to be flagged as improper under applicable Treasury regulations.

60.     Defendants knew or should have known that the IRS would conclude that the charitable contribution deductions from the SCE Strategy were improper, as structured and implemented, due to inter alia the lack of support for the inflated appraisals of the donated property interests, the failure to substantiate a valid conservation purpose, defective Conservation Easement

Deeds, defective Baseline Documentation Reports, the promise of legal charitable contribution tax deductions worth many times more than the amount paid into the Syndicates, and Defendants' other failures to comply with the necessary requirements for claiming proper conservation easement charitable contribution deductions. Despite these issues, Defendants and the Other Participants continued to promote, sell and implement the SCE Strategy and advise Plaintiffs that the SCE Strategy and its tax benefits were legal and legitimate.

61.     In working together to implement the SCE Strategy, Defendants handpicked the appraisers to be used for the SCE Strategy.

62.     These appraisers included Weibel which cast aside its professional obligations and duties and created sham Appraisals with grossly inflated valuations that would not be acceptable to the IRS.

63.     Defendants knew that and intended for these grossly inflated appraisals would be unknowingly used by the Plaintiffs to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs, were completely unsupportable and in violation of some of the most basic rules and concepts for land appraisals.

64.     The appraisals were part of a broader SCE Strategy which included insupportable finding of HBU.  To concoct an HBU that would support the valuation that Defendants sought, the appraisers made false assumptions and ignored inconvenient facts that enabled them to determine a HBU for subject properties for which no objective appraiser would concur. The HBU determined by the appraisers relied on equally improper land development and mining reports (upon information and belief prepared by Ecoventures LLC and Galt Mining LLC) for the express purpose of assisting with SCE scheme.

65.     These reports purported to provide a basis for developing the properties for development or mining purposes when, in reality, Defendants all knew that development or mining was not economically feasible.

66.     Defendants even created a lobbying organization called Partnership For Conservation ("P4C") that was organized in part to disseminate falsehoods about valuation in connection with SCEs to "gaslight" Congress, the IRS and most importantly, prospective investors.

67.     A portion of Plaintiffs investment in the SCE Strategy was paid to the lobbying organization P4C.

68.     In accordance with Defendants' pre-planned scheme, the Appraisers took steps to obscure the inflated nature of the appraisals from Plaintiff, the Class, and the IRS by intentionally omitting key facts from the appraisals.

**D.      Defendants Solicit Dr. Juan's Investment In The SCE Strategy**

69.     In early 2018, Dr. Juan and other members of Plaintiffs' Class received Promotional Materials from Defendants' representatives via email about participating in the SCE Strategy through Hematite Partners (the "Hematite Syndicate"), a company formed and managed by an OSI-affiliated entity.

70.     The Promotional Materials invited potential participants, including Dr. Juan, to purchase an ownership interest in the Hematite Syndicate and informed them that the Hematite Syndicate would, in turn, purchase an ownership interest in Hematite Aggregates LLC. *See* **Exhibit A**.

71.     The Promotional Materials were designed to convince potential participants that the SCE Strategy, through the Hematite Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full

CASE NO.:  24-81421-CIV-DIMITROULEAS

compliance with Section 170(h) of the Code.

72.     Defendants (either directly or indirectly) promised, represented to, and assured the Plaintiffs that these tax deductions from the SCE Strategy were in full compliance with § 170(h) of the Code and all other relevant and applicable laws, rules and regulations. They were not.

73.     The sole purpose of the Promotional Materials, which Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Hematite Syndicate, thus generating enormous fees for Defendants.

74.     The Promotional Materials showed a robust team of licensed professionals who assisted with the evaluation of the enclosed business plan, appraisal of the Property, and overall SCE Strategy,

75.     It was not reasonable to expect that Plaintiffs were knowledgeable and they were not, in fact, knowledgeable about complex tax matters and tax planning. Indeed, that is why Plaintiffs relied on and trusted Defendants and their team of purported experts. Plaintiffs detrimentally relied on Defendants' repeated unequivocal representations that the SCE Strategy was a completely legal tax-advantaged charitable contribution within the meaning of § 170(h) of the Code, which specifically provides that conservation easements, if done properly and legally, create legitimate charitable contributions for income tax purposes

**CLASS ACTION ALLEGATIONS**

76.     Defendants also convinced what is believed to be several hundred of other clients (throughout the United States and in particular in the State of Florida) to execute the SCE Strategy. For these Class Members, the IRS has now indicated it will disallow the charitable deductions and, in most instances, has already disallowed the deductions at the partnership level as well as its intent to disallow them at the individual level.

77.     Upon information and belief, there were only minor, if any, variations in the misrepresentations by Defendants about the effect of applicable tax law standards to the members of the Class. And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and, most importantly, the fraud and misrepresentations by Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate. Thus, Defendants were not simply negligent; they engaged in a pre-planned fraudulent scheme in which all Defendants and others participating knew that the SCE Strategy, as structured and implemented, would fail if challenged by the IRS, despite Defendants' repeated representations to the contrary.

## RICO ALLEGATIONS

78.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c).

79.     At all times relevant hereto, each of Plaintiffs and Defendants were  and  are "persons"  within  the  meaning  of  18  U.S.C. § 1961(3).

80.     To deliver these bogus tax benefits to Plaintiffs, Defendants employed and organized entities and individuals to execute their pre-planned scheme to convince clients to participate in the SCE Strategy. Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed. This association of entities and individuals to structure, promote, sell, and implement the SCE Strategy thereby constitutes a racketeering enterprise.

81.     This racketeering enterprise directly and proximately injured Plaintiffs causing them to pay substantial fees and transaction costs, be exposed to back-taxes, interest and penalties, lose the substantial tax benefits that would have resulted from a properly implemented conservation easement transaction, and incur additional accounting and legal fees and expenses to

deal with the IRS fallout, all resulting from Plaintiffs claiming charitable contribution deductions on their federal and state tax returns based on the fraudulent and defective SCE Strategy and Defendants' advice, recommendations, and assistance in connection therewith

## A.    Enterprise

82.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

83.    In this case, the enterprise ("Enterprise") for RICO and Florida RICO purposes consists of Defendants and all other persons and entities that associated to solicit persons to participate in the fraudulent SCE Strategy for the purpose of generating and sharing fees and commissions derived from the SCE Strategy and alleged tax liability reduction it purported to provide.

84.    These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy qualified as a *bona fide* conservation easement entitling Plaintiff and members of the Class to a noncash charitable contribution deduction under § 170(h) of the Code and relevant regulations.  In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code and the SCE Strategy, as structured, could not support the promised tax benefits.  The SCE Strategy to design, promote, sell, and implement it by means of the numerous fraudulent acts and omissions set out herein, were devised solely to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the  Class).  Defendants have made millions of dollars orchestrating the SCE Strategy.

CASE NO.:  24-81421-CIV-DIMITROULEAS

85.     Defendants sought out as clients those persons, like Plaintiff and other Class Members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants then capitalized to convince the clients, by means of the numerous fraudulent acts and omissions set out herein, to execute the SCE Strategy, for the primary purpose of providing significant revenue for Defendants.   Unbeknownst to Plaintiff and the Class, there was no legitimate  basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

86.     Defendants engaged in a common fraudulent plan, transaction and course of conduct, as described herein, in connection with the design, promotion, sale and implementation of the SCE Strategy.  Defendants knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as fraud upon the Plaintiffs and the Class. The primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

87.     While Defendants participated in the Enterprise and were a part of it, the Defendants also had an existence separate and distinct from the Enterprise.

88.     Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

89.     Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

90.     Syndicated conservation easement deals caught the attention of unscrupulous professionals for several reasons: (a) these deals purported to generate tax deductions that, due to provisions in the Code, could substantially reduce an individual's tax liability; (b) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered by reputable professionals who were alleged experts in the area; (c) due to a rampant oversupply of unproductive real estate that was devalued in the 2008-2009 recession, a vast supply of deals was available to participants in a buffet-like fashion, and (d) a group of eager under-employed real estate appraisers, short on engagements in the wake of the 2008-2009 recession, that were willing to engage in fictitious valuations under the guise of a subject property's HBU that was wildly inflated.

91.     Tax deductible conservation easements are allowed for taxpayers that meet the requirements of Code Section 170(h).  However, Section 170(h) has a rigorous set of qualification criteria that Defendants did not meet with respect to the SCE Strategy, as set out in detail herein. Nevertheless, conservation easements are spelled out in the Tax Code itself, specifically Code Section 170(h), giving professional advisors a hook upon which to lure potential investors who would otherwise avoid these transactions.  Conservation easement promoters had no difficulty convincing potential participants of the validity of the deduction because they pointed to Code Section 170(h).  This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in SCE Strategy.

92.     Defendants had to convince the clients and prospective clients of the validity of the SCE Strategy, which was easy since it is specifically allowed and described in Section 170(h) of the Code.

93.     Each of the Defendants were vital to the implementation of the SCE Strategy, played a vital role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise; thus, each had some part in directing the enterprise's affairs, not just their own.  Each engaged in either or both of the following: (a) in marketing the SCE Strategy to Plaintiffs and the Class, or (b) in providing incomplete and misleading legal opinions, tax returns, appraisals and other documents designed to promote or implement the SCE Strategy. Further, Defendants were not merely performing ordinary business services.  Rather, the Defendants were part of the operation and direction of the Enterprise because they performed tasks they do not ordinarily perform.  These tasks include, among other things, providing information for promotional pitches of the Syndicates; inserting false conservation purposes into the Baseline Documentation Reports and other documents; commissioning and preparing fraudulent business plans for development or mining; commissioning and preparing grossly inflated appraisals; signing IRS Appraisal Summaries and other IRS filings that reflect these grossly inflated appraised values; and prioritizing fees and director compensation over land conservation.  Furthering a fraud in these manners is not operating as they ordinarily would.  A further description of the role each played is as follows:

     a.     OSI was experienced in syndicated land ownership transactions and they began doing conservation easements in 2012.  OSI functioned as a Sponsor of the SCE Strategy and assisted in the preparation of all of the SCE Strategy transaction documents, including the Promotional Materials, Conservation Easement Deeds, Appraisal Summaries (Form 8283), and Baseline Documentation Reports.  OSI, hand-selected the other "experts" to

join the conspiracy to promote and implement the SCE Strategy.

b.      Weibel provided the following services to each Syndicate: preparation of the Appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates); permitted the front-line promoters of the SCE Strategy to utilize their Appraisals in the Promotional Materials for the purpose of convincing potential participants that the SCE Strategy provided legal and legitimate tax savings through the contribution of a conservation easement; and signed the Appraisal Summary (Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction 39 in the years in which their Appraisal was used to support the charitable contribution deduction provided by the SCE Strategy. Weibel received substantial fees for their appraisal work and their work on the Forms 8283.

a.      Accounting firms/accountants prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns. These Defendants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were

being used in connection with the SCE Strategy and would result in the Plaintiff and members of the Class claiming charitable.

b.      Consultants purportedly completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of conservation of each such parcel and/or to Support the HBU for the property (which would be used in the Appraisals and for determining the value of the conservation easement). Assisted Defendants in the design, structure, promotion, sale, and/or implementation of the SCE Strategy.

c.      Galt Mining assisted Defendants in the design, structure, promotion, sale, and/or implementation of the SCE Strategy.

## B.      Predicate Acts

### 1.      *Criminal Wire Fraud: Violation of 18 U.S.C. § 1343*

94.      In or about and between 2018 and continuing to this day, within the Southern District of Florida and elsewhere, Defendants together with members, participants and wrongdoers of a criminal enterprise, did knowingly, intentionally, and willfully conspire to use and employ manipulative and deceptive devices and contrivances and directly and indirectly (a) employ devices, scheme and artifice to defraud third party investors; (b) to make untrue statements of material facts and omit facts to state facts necessary in order to induce those fraudulent investments; and (c) to engage in acts, practices and courses of conduct which would and did operate as a fraud and deceit upon the third party investors, in connection with the fraudulent scheme, and by use of the instruments of communication interstate commerce and the mails, all in violation of Title 18 U.S.C. §§1341, 1343.

95.     In their operation and control of the Enterprise, including the failure to disclose the true purpose of solicited investments in the Company, the Insiders conducted an undisclosed scheme to embezzle money from third-party investors through numerous violations of the federal criminal wire fraud statute.

96.     All of the fraudulent investments were perpetrated by Defendants' simultaneous violation of fiduciary obligations of trust and loyalty and avoidance of conflicts that they owed to Plaintiffs.

97.     Accordingly, the activities of the Insiders, as described in this Amended Class Action Complaint, formed a pattern of numerous related violations of the criminal wire fraud statute.

### 2.     *Money Laundering: Violation of Title 18 U.S.C. § 1957*

98.     18 U.S.C. § 1957 provides criminal penalties for a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

99.     In or about and between 2018 and continuing to this day, within the Southern District of Florida - Miami Division and elsewhere, Defendants, together with others unknown and members of a criminal enterprise, knowingly and intentionally engaged in monetary transactions in criminal derived property that was of value greater than $10,000.00 and was derived from specified unlawful activity, to-wit: wire fraud, securities fraud, common fraud, fraudulent conveyance or conversion of property, felony theft, by defrauding third party investors with the use various federal insured financial institutions, all in violation of Title 18 U.S.C. §§ 1957 and 2.

100.     Defendants used the various entities to violate § 1957, in that they knowingly engaged, as described in this Amended Class Action Complaint, in numerous transactions

involving the interstate transfer of funds by wire in criminally deprived property, each in the amount greater than $10,000, which were in fact proceeds of specific unlawful activity—to wit, wire fraud, securities fraud, bank fraud, interstate and foreign transportation in aid of racketeering enterprises, as further described herein.

### 3. Interstate And Foreign Transportation In Aid Of Racketeering Enterprises In Violation Of 18 U.S.C. § 2314

101.    Among the numerous predicate acts committed by the Insider Defendants were violations of 18 U.S.C. § 1952, which makes it a federal crime to use any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity.  As described throughout this Amended Class Action Complaint, the Insiders violated this provision by using facilities of interstate commerce in the form of bank wire transfers, with the intent to distribute those proceeds of unlawful activities of money laundering under 18 U.S.C. § 1957, and to promote, manage, establish and carry on, and to facilitate, the promotion, management establishment, or carryon on, of this unlawful activity of money laundering in violation of the aforementioned statute.

102.    These same acts permitted, continued, and facilitated the promotion and carryon of money laundering by effecting transfers to, from, and through the Enterprise in the carrying out of the scheme or schemes to defraud and the Enterprise.

### 4. Interstate And Foreign Transportation Of Stolen Monies In Violation of 18 U.S.C. § 2314

103.    The Insiders also committed numerous predicate acts in violation of 18 U.S.C. § 2314, in that they transferred, in interstate commerce as described herein, through banks, money in the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.  These transfers were conducted pursuant to a scheme to embezzle.

104.    In or about and between 2018 and continuing to this day, within the Southern District of Florida and elsewhere, Defendants, together with members of the enterprise and others unknown, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did knowingly, and intentionally conspire to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to-wit: mail and wire fraud, securities fraud, theft, common fraud, felony theft, fraudulent conveyance or conversion of property, (a) with the intent to promote the carrying on of the specified unlawful activity, and (b) knowing that the transactions were designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of such proceeds, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), all in violation of 18, U.S.C. § 1956(h).

105.    As a direct result of the foregoing, Plaintiffs have been harmed.  In addition to actual damages as a result of these unlawful and fraudulent activities, Plaintiffs are entitled to treble damages and an award of attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

106.    Defendants misrepresented and omitted material facts about the purported tax benefits of investing in the SCEs, the ability to realize those benefits, the true fair market value of the properties that would be encumbered, and other things.  Defendants knew or were recklessly indifferent to the true state of affairs and that the statements were made with an intent to deceive, manipulate, or defraud.

107.    Defendants had access to information (both public and proprietary) which contradicted their client-facing statements but were deliberately withheld from Plaintiffs in order to further the misconduct alleged herein.

108.    The statutory safe harbor for 'forward looking' statements under certain

circumstances does not apply to the statements and representations described in this First Amended Complaint, which were not forward looking when made.  For the most part, the statements were (mis)representations of present fact, or representations of law made by persons of authority who held themselves out as experts, but who financially benefitted from Plaintiffs reliance thereon.  To the extent the safe harbor does apply, Defendants are still liable because, at the time such statements were made, the person making them was making them with criminal intent or at the direction of a person with criminal intent.

**C.      Timeliness of Plaintiffs' Claims**

109.    Plaintiffs did not and could not discover the wrongful acts of Defendants or the injuries caused by the wrongful acts of Defendants alleged herein until shortly before the filing of this lawsuit.

110.    In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

**D.      The Final Hook: Brown's March 19, 2019 E-Mail And Dr. Juan's Reliance Thereon**

111.    In late March 2019, Dr. Juan reached out to Brown.

112.    Therein, the two agreed to speak by phone.

113.    On March 19, 2019, and ahead of that call, Dr. Juan specifically inquired of Defendants: [2]

> I do not mean to doubt your firm, but I am not an investment expert.
> I want to be assured that the investment I made is in full compliance
> with IRS rules and regulations.

114.    Brown (on his own behalf and on behalf of all of Defendants) almost immediately responded the same day:

---

[2]   A copy of the March 19, 2019 correspondence is attached hereto as **<u>Exhibit B.</u>**

> All of our offerings are in full compliance with IRS rules and regulations. As I had mentioned previously, this is the main reason why we have 3 in house tax attorneys on staff with us. One of those tax attorneys worked as a senior counsel for the IRS for 10 year prior to joining our firm.

*See* **Exhibit B**.

115.    This representation of legal compliance was woefully false.

116.    As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and interest, and have paid significant professional fees in connection with the IRS disputes.

**E.    Plaintiffs' Claims Were Timely Filed Or, Alternatively, The Discovery Rule And Equitable Tolling Deferred Accrual Of The Statute of Limitations As To All Defendants**

117.    The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

118.    In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

119.    Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein shortly before the filing of this lawsuit.

120.    Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE Strategy complied with all applicable tax laws and regulations and would be accepted by the IRS.  In making these representations and providing this

advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy. In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants at an earlier date.  Defendants and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovering the nature of their claims.

121.    Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through the filing of this Complaint.

122.    In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

F.    **Defendants Provided Unlawful Tax Advice**

123.    Defendants were Dr. Juan's tax advisors.

124.    Defendants, individually and collectively, worked with the Return Preparers.

125.    The Return Preparers prepared the partnership tax returns for the Syndicates used in the SCE Strategy, as well as the K-1s that were issued to each of the Plaintiff and members of the Class containing what the Return Preparers represented to the IRS, under penalties of perjury, was their proportionate share of their respective Syndicate's charitable contribution deduction resulting from the SCE Strategy.

126.    The Return Preparers prepared the K-1s with the intent that Plaintiffs would utilize their respective K-1 to claim the grossly exaggerated charitable contribution deduction from the SCE Strategy. The Return Preparers instructed Plaintiffs to report the amount set out in the K-1 as a charitable contribution deduction on their individual tax returns; indeed, Plaintiffs were required

to do so by applicable Federal law. Furthermore, the impact of the items from the K-1 on each of Plaintiffs' tax returns was so substantial that the Return Preparer for that K-1 and corresponding entity return would be deemed under Federal law as that Plaintiff's "tax return preparer," regardless of whom entered the item on the Plaintiffs' Form 1040 or schedules.

127.    In fact, Defendants directed the Return Preparers to prepare and send K-1s to Dr. Juan.

128.    However, the IRS began scrutinizing the fraudulent Appraisals and other defects, and determined that the SCE Strategy, as structured and implemented, does not comply with the requirements of Section 170(h) of the Code and other applicable laws and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations.

129.    From 2018 through the present, some or all of Defendants provided information which, when sent to Plaintiff and other Class members as part of his tax preparation, contained material misrepresentations and/or omissions, including but not limited to:

      a.    The treatment that Plaintiffs would receive from charitable contributions made for tax purposes;

      b.    The tax deductibility and qualification of Plaintiffs' charitable contribution;

      c.    The appropriateness, data, and methodology of the appraisals commissioned by Defendants; and

      d.    The compliance with various IRS and Treasury regulations.

130.    All conditions precedent to filing this action have either occurred or been waived by Defendants' conduct and course of dealing.

## COUNT I: VIOLATIONS OF FEDERAL RICO STATUTE 18 U.S.C. § 1962(c)
### (Against All Defendants)

131.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

132.    18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

133.    Plaintiffs are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

134.    Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

135.    At all times of the activities referred to in this Complaint, Defendants formed an association-in-fact for the purpose of orchestrating tax fraud against Plaintiffs. This association was an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4).

136.    Plaintiffs reallege and incorporate their allegations regarding the Enterprise (¶¶ 82 – 93 of this Amended Class Action Complaint) as if fully set forth herein.

137.    Plaintiffs reallege and incorporate their allegations that Defendants engaged in a pattern of racketeering activity (¶¶ 94 – 108 of this Amended Class Action Complaint) as if fully set forth herein.

138.    At all relevant times, the Enterprise was engaged in and its activities affected interstate and foreign commerce in the manner described herein.

139.    Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiff and members of the Class of significant sums of money. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to

CASE NO.:  24-81421-CIV-DIMITROULEAS

effectuate the fraudulent transactions. The Enterprise allows Defendants this access.

140.    Defendants, using their positions of control over the SCE, caused interstate wires to be made in violation of federal law, which transfers had the direct effect of causing injury to the unsuspecting victims of their fraud across the country.

141.    This pattern was extensive, covering a period over a year and, upon information and belief, continues through the present (since Dr. Juan has not been able to divest his ownership and control in the partnership).

142.    Defendants perpetrated this criminal enterprise throughout their control over the corporate Enterprise and its assets.

143.    With respect to the activities alleged herein, Defendants have acted at all times with malice toward Plaintiff and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

144.    Defendants regularly communicated with one another and third parties, including with Dr. Juan and other Class members, via interstate wire communications (*i.e.*, email correspondence, and phone calls) in furtherance of their fraudulent scheme.

145.    At all relevant times Defendants with others known and unknown were associated in fact and constituted an enterprise engaged in the and the activities of which affected, interstate and foreign commerce within the meaning of Title 18 U.S.C. §§ 1961(4) and 1964(c), and did conduct or participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity within the meaning of inter alia 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, et seq., as set forth more fully above.

146.    Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C.

§ 1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

147.    As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiff and members of the Class have been injured in their business or property as described above.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT II: CONSPIRACY TO VIOLATE FEDERAL RICO STATUTE 18 U.S.C. § 1962(c)
### (Against All Defendants)

148.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

149.    This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

150.    Plaintiffs reallege and incorporate their allegations regarding the Enterprise as if fully set forth herein.

151.    Plaintiffs reallege and incorporate their allegations that Defendants engaged in a pattern of racketeering activity as if fully set forth herein.

152.    Section 1962(c) of RICO provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (1), (b), (c) of this section."

153.    Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. § 1962(d), in violation of 18 U.S.C. § 1962(c), and conducted and

CASE NO.:  24-81421-CIV-DIMITROULEAS

participated, directly and indirectly, in the conduct of the affairs of the Enterprise as alleged herein.

154.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiff and the Class of money and other property interests.

155.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

156.    In furtherance of the above-described conspiracy, and to affect its objectives, the participants in the Enterprise committed and agreed to commit overt acts or have others commit overt acts on their behalf in the Southern District of Florida and elsewhere.

157.    Defendants and their co-conspirators have engaged in the commission of—and continue to commit—overt acts and the following described unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

    a.    Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

    b.    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;

    c.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

    d.    Multiple instances of money laundering in violation of Title 18 U.S.C. §§ 1956 and 1957.

158.    Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators possess greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

159.    Defendants knew or should have known that their predicate acts as described in this Amended Class Action Complaint were part of a pattern of racketeering activity, and did agree with each other unknown persons to the commission of those acts to further the scheme to defraud and to commit the violations of federal criminal law described in this Complaint, and did commit overt acts in furtherance thereof.  The conspirators' conduct constitutes violations of 18 U.S.C. § 1962(d).

160.    Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

161.    By reason of violation of 18 U.S.C. § 1962(d) committed by Defendants aforenamed, Plaintiff and members of the Class were injured and sustained a loss, within the meaning of 18 U.S.C. § 1964(c), in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT III: VIOLATION OF FLORIDA RICO STATUTE
### (Against All Defendants)

162.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

163.    Plaintiffs reallege and incorporate their allegations regarding the Enterprise (¶¶ 82 – 93 of this Amended Class Action Complaint) as if fully set forth herein.

164.    Plaintiffs reallege and incorporate their allegations that Defendants engaged in a pattern of racketeering activity (¶¶ 94 – 108 of this Amended Class Action Complaint) as if fully set forth herein.

165.    Beginning in or about 2018 and continuing to the present day, Defendants, who were associated with the Enterprise through their ownership and/or control of the SCE entities, engaged in an extensive pattern of activities that are and were subject to indictment as criminal offenses listed in 18 U.S.C. § 1961(1) for violations of the provisions of federal criminal law described as having been committed by them in Counts I and II above.

166.    Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

167.    Through the pattern of criminal activity described throughout this Complaint, Defendants, acting with criminal intent, have directly and indirectly received the benefits from their criminal activity, committed violations of Fla. Stat. §§ 772.103(1)-(3) and 772.103(4).

168.     As a direct and proximate result of Defendants' criminal conduct in violation of Section 772.103, Florida Statutes, those members of the Class in Florida have been injured and sustained damages in an amount to be proved at trial.  Further, Plaintiff and the Class members are entitled to treble damages and an award of attorneys' fees and costs pursuant to Section 772.104(1), Florida Statutes.

WHEREFORE, Plaintiffs who qualify for this sub-Class respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; treble damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT IV: COMMON LAW NEGLIGENCE
### (Against All Defendants)

169.     Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

170.     As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care. Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of Defendants.

171.     Defendants failed to meet their applicable standards of care.

172.     Defendants' failure to meet their respective standards of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

173.     Defendants' failures to meet the applicable standards of care constitute negligence.

174.     Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiff and members of the Class. In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiff and members of the Class: (a) paid substantial sums of money to participate in the SCE Strategy; (b) paid fees to Defendants for advice and services; (c) lost the tax savings that could have been provided had the SCE Strategy been properly implemented in compliance with Section 170(h) of the Code; (d) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (e) failed to file a qualified amended return.

175.     Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against Defendants, jointly and severally.

176.     But for Defendants' negligence/gross negligence, Plaintiff and members of the Class would not have agreed to engage in the SCE Strategy, filed and signed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and spent substantial funds in connection with IRS audits and Tax Court proceedings.

177.     As a result of Defendants' negligent and grossly negligent acts and omissions, Plaintiff and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

178.     Defendants' negligence/gross negligence proximately caused damages to Plaintiff and members of the Class in that they (a) paid substantial funds to participate in the SCE Strategy,(b) paid significant fees to Defendants, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had

the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) have incurred and will continue to incur substantial additional costs to rectify the situation.

179.    As a proximate cause of the foregoing, Plaintiff and members of the Class have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT V: NEGLIGENT MISREPRESENTATION
### *Pled in the Alternative to Fraud*
**(Against All Defendants)**

180.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

181.    During the course of their representation of Plaintiff and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count IX below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiff and members of the Class. In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

182.    Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong. Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiff and members of the Class were improper and wrong and would mislead Plaintiff and members of the Class.

183.    As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, Defendants owed Plaintiffs and the members of the Class a duty to correctly state all facts regarding the SCE Strategy. Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of Defendants.

184.    Plaintiff and members of the Class reasonably relied upon Defendants' misrepresentations and advice.

185.    Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiff and members of the Class. In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiff and members of the Class: (a) paid substantial sums to participate in the SCE Strategy; (b) paid substantial fees to Defendants for professional advice and services; (c) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (d) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (e) did not file a qualified amended return; and (f) spent substantial funds in connection with IRS audits and Tax Court proceedings.

186.    Defendants' conduct set forth herein proximately and directly caused Plaintiff and members of the Class to suffer injury in that Plaintiff and members of the Class (a) paid substantial sums to participate in the SCE Strategy,(b) paid significant fees to Defendants advice and services, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) have and will continue to incur substantial additional costs to rectify the situation.

187.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT VI: BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

188.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

189.    As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, Defendants became fiduciaries of the Plaintiffs and the members of the Class. Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the

Plaintiffs and the members of the Class. Thus, these Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.

190.    Defendants breached these duties and caused Plaintiff and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

191.    Defendants' breaches were a proximate cause of damages to Plaintiffs. In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs: (a) paid substantial sums of money to participate in the SCE Strategy; (b) paid fees to Defendants for professional advice and services; (c) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (d) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (e) failed to file a qualified amended return; and (f) spent substantial funds in connection with IRS audits and Tax Court proceedings.

192.    Defendants' conduct set forth herein proximately and directly caused Plaintiff and members of the Class to suffer injury in that Plaintiff and members of the Class (a) paid substantial sums to participate in the SCE Strategy, (b) paid  significant fees to Defendants for advice and services, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) have and will continue to incur substantial additional costs to rectify the situation.

193.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial.

194.    As a result of these Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

195.    Accordingly, these Defendants must disgorge all such payments in favor of Plaintiff and members of the Class in an amount to be proven at trial and seek an award of attorneys' fees, interest, and costs.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT VII: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against All Defendants)**

196.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

197.    As described more fully through this Amended Class Action Complaint, each of Defendants aided and abetted the breaches of fiduciary duty of each of the other Defendants and third parties. Each aiding Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

198.    Each of the aiding Defendants acted to procure the breach of the other Defendants' fiduciary duties through improper conduct and without privilege. Each of the aiding Defendants

did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty. Each of the aiding Defendants also acted purposely and with malice and the intent to injure. Each of Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty and each of the aiding Defendants' tortious conduct proximately caused damage to Plaintiffs.

199.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiff and members of the Class have suffered injury in that they (a) paid substantial sums to participate in the SCE Strategy, (b) paid significant fees to Defendants and third parties, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) have and will continue to incur substantial additional costs to rectify the situation.

200.    As a direct and proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages. Plaintiff and members of the Class have been injured in an actual amount to be proven at trial.

201.    Further, as a result of these Defendants' aiding and abetting the breach of fiduciary duties by others, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive

damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## **COUNT VIII: FRAUD**
**(Against All Defendants)**

202.     Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

203.     In order to induce Plaintiff and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to Defendants, Defendants directly and indirectly, through themselves and others, made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiff and members of the Class, as set forth above and the following:

    a.    Misstating, in light of published authorities and guidance from the IRS, the tax treatment Plaintiff and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

    b.    Advising Plaintiff and members of the Class that the donation of the conservation easement was tax deductible as a qualified charitable contribution deduction;

    c.    Advising Plaintiff and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution;"

    d.    Failing to advise Plaintiff and members of the Class that the alleged value of the conservation easement and associated tax benefits in the SCE Strategy constituted a gross valuation overstatement, thus

subjecting Plaintiffs to penalties;

e.   Advising Plaintiff and members of the Class that the appraisal commissioned by Defendants relied on appropriate assumptions, data, and methodology;

f.   Failing to advise Plaintiff and members of the Class that the appraisal commissioned by Defendants relied on inappropriate assumptions, data, and methodology;

g.   Advising Plaintiff and members of the Class that the appraisal commissioned by Defendants complied with § 170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

h.   Failing to advise Plaintiff and members of the Class that the appraisal commissioned by Defendants did not comply with § 170 of the Code and regulations, and with general and substantive real property appraisal standards and practices;

i.   Advising Plaintiff and members of the Class that the appraisal commissioned by Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

j.   Providing false valuation statements to Plaintiff and members of the Class, including the fair market value of the conservation easement;

k.   Failing to advise Plaintiffs and members of the Class that the Syndicate did not donate a "qualified real property interest" because

the property that was the subject of the conservation easement could be modified;

l. Failing to advise Plaintiffs and members of the Class that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

m. Failing to advise Plaintiffs and members of the Class that the Syndicates did not properly document the condition of the property at the time of the donation;

n. Failing to advise Plaintiffs and members of the Class that the SCE Appraisers were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

o. Advising Plaintiffs and members of the Class that the Syndicates donated a "qualified real property interest;"

p. Advising Plaintiff and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

q. Failing to advise Plaintiff and members of the Class that the appraiser relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

CASE NO.:  24-81421-CIV-DIMITROULEAS

r.     Failing to advise Plaintiff and members of the Class that the appraiser incorrectly reached unsupportable and/or predetermined conclusions;

s.     Advising Plaintiff and members of the Class that the Appraisals conformed with applicable laws and regulations;

t.     Failing to advise Plaintiffs and members of the Class that the SCE Appraisers arrived at the unsupportable HBUs by ignoring local zoning rules and other legal restrictions on purported developments, physical and financial feasibility, market conditions, and market data;

u.     Advising Plaintiffs and members of the Class that the Appraisals conformed with USPAP;

v.     Failing to advise Plaintiff and members of the Class that the Appraisals did not follow the law and applicable regulations because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

w.     Advising Plaintiff and members of the Class that the Appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

x.     Failing to advise Plaintiff and members of the Class that the Appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

y.      Advising Plaintiff and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

z.      Failing to advise Plaintiff and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

aa.     Advising Plaintiff and members of the Class that the property has specific conservation values that satisfy the Code;

bb.     Failing to advise Plaintiff and members of the Class that the property did not have specific conservation values that satisfy the Code;

cc.     Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

dd.     Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

ee.     Advising Plaintiff and members of the Class that the conservation easement restrictions complied with the Code requirement that they must be perpetual;

ff.     Failing to advise Plaintiffs and members of the Class that the conservation easement restrictions did not comply with the Code requirement that they must be perpetual;

gg.     Advising Plaintiff and members of the Class that the conservation

easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in Section 170 of the Code;

hh.     Failing to advise Plaintiff and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in Section 170 of the Code;

ii.     Advising Plaintiff and members of the Class that the Appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

jj.     Failing to advise Plaintiff and members of the Class that the Appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

kk.     Advising Plaintiff and members of the Class that the highest and best of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a

non-cash charitable contribution of a partial interest, when in fact it was not;

ll.    Advising Plaintiff and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (i) used an incorrect and unsupportable HBU conclusion; (ii) failed to employ recent, local and similar sales; (iii) lacked objectivity and appropriate analysis of after easement sales; (iv) lacked consideration of easement sales; and (v) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

mm.    Failing to advise Plaintiffs that the "before value" is unreasonable and is not an estimate of the fair market value as of the date of the valuation before the easement conveyance;

nn.    Advising Plaintiff and members of the Class that a qualified appraiser did the appraisal when in fact it was not due to the abundant acceptance of direction by the appraiser from the other Defendants which resulted in an inflated fair market value of the conservation easement;

oo.    Advising Plaintiff and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on the income tax return was proper;

pp.   Failing to advise Plaintiff and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

qq.   Failing to advise Plaintiff and members of the Class that the subject of valuation was not financially feasible and, therefore, improper;

rr.   Failing to advise Plaintiff and members of the Class that the Appraisals did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser;"

ss.   Failing to advise Plaintiffs that the Appraisals were not qualified appraisals under §170 of the Code because the highest and best use was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

tt.   Failing to advise the Plaintiffs that the Appraisals were not "qualified appraisals" under Section 170 of the Code because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's HBU;

uu.   Advising Plaintiffs that the conservation easement substantiated a valid conservation purpose;

vv.   Failing to advise Plaintiffs and members of the Class that the Deed of Conservation Easement did not substantiate a valid conservation

purpose;

ww.   Advising Plaintiffs that the Baseline Documentation Report supported a valid conservation purpose on the property;

xx.   Advising Plaintiffs and members of the Class that the Deed of Conservation protected the land in perpetuity and therefore qualified for a federal charitable deduction;

yy.   Failing to advise Plaintiffs that the Baseline Documentation Report did not support a valid conservation purpose on the property;

zz.   Advising Plaintiff and members of the Class that a Deed of Conservation would permit activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

aaa.   Failing to advise Plaintiff and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid conservation purpose and therefore did not qualify for a federal charitable deduction;

bbb.   Advising Plaintiff and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

ccc.   Failing to advise Plaintiff and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

ddd.   Advising Plaintiff and members of the Class to report the charitable contribution deduction on their individual tax returns;

eee.    Advising Plaintiff and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was proper and accurate and should be used to report the deduction on their individual return;

fff.    Failing to advise Plaintiff and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

ggg.    Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based on the fair market value of the conservation easement determination in the appraisal;

hhh.    Advising Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be allowed if audited;

iii.    Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed if audited;

jjj.    Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was different and distinguishable from other SCE Strategies that the IRS and/or Tax Court had disallowed;

kkk.    Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was  not different and distinguishable from other SCE Strategy that

CASE NO.:  24-81421-CIV-DIMITROULEAS

the IRS and/or Tax Court had disallowed;

lll.    Advising Plaintiffs and members of the Class that they should challenge the IRS in the audits and/or Tax Court proceedings because Plaintiffs and members of the Class would prevail and the SCE Strategy would be allowed;

mmm.    Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in audits and/or Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the SCE Strategy would be disallowed;

nnn.    Making and endorsing the statements and representations contained in Defendants' written advice, instructions, and recommendations; and

ooo.    Failing to advise Plaintiff and members of the Class that each Defendant was not "independent" of one another and in fact engaged in a conspiracy to design, market, sell, and implement the SCE Strategy.

204.    The above affirmative misrepresentations and/or intentional omissions of material fact made by Defendants were false when made, and Defendants knew these representations to be false when made with the intention that Plaintiff and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to Defendants.. In addition, Defendants knowingly made the above affirmative misrepresentations and/or intentional omissions of material fact with the intent to induce Plaintiff and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the

SCE Strategy, and pay substantial fees to Defendants.

205.    In reasonable reliance on the false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiff and members of the Class engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to Defendants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy.

206.    But for Defendants' intentional misrepresentations and material omissions described above, Plaintiff and members of the Class would not have hired Defendants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to Defendants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

207.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiff and members of the Class have suffered injury in that they (a) paid substantial funds to participate in the SCE Strategy, (b) paid significant fees to Defendants, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

208.    As a proximate cause of the foregoing injuries, Plaintiffs and  members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

## COUNT IX: RESCISSION
### *Pled in the Alternative*

209.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

210.    In connection with the SCE transactions, Plaintiff and members of the Class were provided with documents purporting to disclaim or limit the rights of Plaintiff and members of the Class.  In deciding to engage in the SCE transactions, Plaintiff and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact made to Plaintiff and members of the Class, including but not limited to those set forth (or incorporated) elsewhere in this Complaint. Had Defendants not made those misrepresentations or omissions; Plaintiff and members of the Class would not have engaged in the SCE transactions. Defendants made those misrepresentations and omissions with the intent that Plaintiff and members of the Class would rely on them. Further, the concealment is of intrinsic qualities of the features of the SCE Strategy (such as, highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE satisfied Code

170 and regulations promulgated thereunder) which the Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to Federal tax consequences, under well-established law had no duty to seek to discover. Alternatively, Defendants had a duty to disclose these matters.

211.    Thus, Defendants fraudulently induced Plaintiff and members of the Class to enter into the SCE transactions in furtherance of the conspiracy among the Defendants.

212.    Plaintiffs seek rescission of all agreements they entered and all documents they received in connection with entering into the SCE transactions, including the Purported Disclaimers. Collectively, there is more than $5 million at issue. In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

213.    Plaintiffs had no duty to rescind before filing, nor to restore any consideration because it would be unreasonable to require them to do so, if not impossible, given disposition of all of the assets of the PropCos/LLCs and the years of tax returns already filed and under audit.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for rescission of all agreements they entered into and all documents they received in connection with entering into the SCE transactions, attorneys' fees and costs; and such other and further relief which the Court deems just and proper.

## COUNT X: CIVIL CONSPIRACY
### (Against All Defendants)

214.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

215.    As described more fully above, Defendants knowingly acted in concert to design, market, sell, and implement the SCE Strategy. In furtherance of their conspiracy, Defendants conspired to perpetrate fraud on the Plaintiff and members of the Class and to breach fiduciary

duties owed to Plaintiff and members of the Class. In doing so, Defendants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

216.   Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiff and members of the Class to participate in the SCE Strategy and pay substantial fees. Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class. Defendants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or third party made to Plaintiff and members of the Class.

217.   The acts of Defendants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiff and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiff and members of the Class.

218.   There was a meeting of the minds between and among Defendants commit the unlawful acts alleged herein, including a conspiracy to fraud on and to breach fiduciary duties owed to Plaintiff and members of the Class. The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to Plaintiff and members of the Class as previously set forth herein.

219.    As a direct and proximate result of Defendants' conduct set forth herein, Plaintiff and members of the Class have suffered injury in that they (a) paid substantial sums to participate in the SCE Strategy, (b) paid significant fees to Defendants and third parties, (c) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (d) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (e) have and will continue to incur substantial additional costs to rectify the situation.

220.    Plaintiff and members of the Class have been injured in an actual amount in excess of $5 million to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, for actual, consequential and incidental damages; disgorgement; pre-judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and costs; punitive damages to be determined at trial; and such other and further relief which the Court deems just and proper.

### COUNT XI: UNAUTHORIZED PRACTICE OF LAW
### (VIOLATION OF FLA. STAT 454.23)
### (Against Defendant Jason Brown)

221.    Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 108 as if fully set forth herein.

222.    Section 454.23, Florida Statutes, provides:

> Any person not licensed or otherwise authorized to practice law in this state who practices law in this state or holds himself or herself out to the public as qualified to practice law in this state, or who willfully pretends to be, or willfully takes or uses any name, title, addition, or description implying that he or she is qualified, or recognized by law as qualified, to practice law in this state, commits

a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

223.    Brown (on his own behalf and on behalf of OSI) made the following representation

to Plaintiff:

> All of our offerings are in full compliance with IRS rules and regulations. As I had mentioned previously, this is the main reason why we have 3 in house tax attorneys on staff with us. One of those tax attorneys worked as a senior counsel for the IRS for 10 years prior to joining our firm.

*See* **Exhibit B**.

224.    Brown (on his own behalf and on behalf of OSI) through his course of dealing with

Plaintiff and other similarly situated Class Members, held himself out as authorized to practice law

in the State of Florida.

225.    Brown (on his own behalf and on behalf of OSI) through his course of dealing with

Plaintiff and other similarly situated Class Members, engaged in the unauthorized practice of law

in the State of Florida by, *inter alia*, opining on compliance with IRS rules and regulations.

226.    Plaintiff and other similarly situated Class members relied, in whole or in part, on

similar representations and opinions of law expressed by Brown, the Vice President of Investments

for OSI.

227.    As a result, Plaintiff and similarly situated Class members have been damaged.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against

Defendant Jason Brown for actual, consequential and incidental damages; disgorgement; pre-

judgment and post-judgment interest at the highest legal rate allowed by law; attorneys' fees and

costs; punitive damages to be determined at trial; and such other and further relief which the Court

deems just and proper.

Page 69                                    CASE NO.:  24-81421-CIV-DIMITROULEAS

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated:  <u>July 7, 2025</u>                    Respectfully submitted,

**PARDO LAW PLLC**
*Lead Counsel for Plaintiff*

By: <u>*/s/ Joseph I. Pardo, Esq.*</u>
    Joseph I. Pardo, Esquire
    Florida Bar No. 1003339
    Melissa L. Mackiewicz, Esquire
    Florida Bar No. 0637971

1205 Lincoln Road, Suite 211
Miami Beach, Florida 33139
Tel: (305) 308-7388
Email: <u>joe@pardolawmiami.com</u>
        melissa@pardolawmiami.com

**BIZTX LAW, P.A.**
*Co-Counsel for Plaintiff*

By: <u>*/s/ Adam J. Smith, Esq.*</u>
    Adam J. Smith, Esquire
    Florida Bar No. 100024

11940 S Baypoint Circle
Parkland, Florida 33076
Tel: (954) 824-1997
Fax: (954) 689-2826
Email: <u>asmith@biztxlaw.com</u>

**Pardo Law PLLC · 1205 Lincoln Road · Suite 211 · Miami Beach, Florida  33139**